[Civ. No. 26326.   Second Dist., Div. One.   Nov. 26, 1962.]

BADIA JACOBS, Plaintiff and Appellant, v. BEN MED-FORD et al., Defendants and Respondents.

Badia Jacobs, in pro. per., for Plaintiff and Appellant.

Lillick, Geary, McHose, Roethke & Myers, Ernest J. Schag, Jr., Robert P. Myers, Victor S. Netterville and Stephen F. Keller for Defendants and Respondents.

WOOD, P. J.—Plaintiff appeals from a summary judgment in this action for damages for infringement of plaintiff's alleged rights in a literary composition.

The complaint alleges as follows: That between March 1944 and January 1948 the plaintiff conceived, originated, and wrote a new and original manuscript titled "No Alternative." That said work was completed in January 1948 and that plaintiff has not published said manuscript, nor has she permitted any person or corporation to publish said work in book, dramatic, or any other form. During 1948 she contacted defendant Ben Medford, a writer's agent in Beverly Hills, and relinquished the manuscript to him upon his promise to submit it for revision to defendant Max Catto, a writer. On several occasions thereafter Medford informed her that he has having no success in selling the manuscript to a studio. In 1950 a book titled "The Killing Frost," written by defendant Catto, was published by Heinman Company in London. That book was written, published, and sold without plaintiff's consent and in infringement of her common law property rights. That book was copied largely from plaintiff's manuscript. Thereafter a "movie" was produced by defendants Hecht and Lancaster and Susan Productions, Inc., and released through defendant United Artists,

and it has been exhibited in Los Angeles County and throughout the United States. Said picture was based upon the book titled "The Killing Frost." Such production and exhibition were made without plaintiff's consent and in infringement of her common law property rights. She alleges upon information and belief that defendant Hill produced the "movie," that defendant Webb wrote the screen play, and defendant O'Brien wrote the adaptation. Plaintiff first learned of said infringement during 1956 when she saw the picture, and she did not learn until sometime thereafter that her manuscript had been copied by defendant Catto in his said book, "The Killing Frost." Thereupon she contacted Medford who informed her that she had no rights or property in her manuscript "since" it had not been published or copyrighted. Medford was aware of the infringement and participated in it.

Defendants Medford, Susan Productions, Inc., Hill, Hecht, and Lancaster filed answers wherein they denied the material allegations of the complaint, and alleged affirmative defenses which included: that defendants had no access to the manuscript; and there is no substantial similarity between the manuscript and the picture.

It was stipulated, in the trial court, that the manuscript titled "No Alternative" should be filed and become part of the complaint. Pursuant thereto that manuscript was filed.

Defendants' motion for summary judgment was made upon the grounds (1) that as a matter of law there is no similarity between plaintiff's manuscript and anything in the alleged infringing production, (2) that none of the defendants, except Medford, had access to the manuscript and that Medford had nothing to do with the creation of the alleged infringing production; and, therefore, there is no triable issue of fact and the action has no merit.

In support of the motion, defendants filed an affidavit of defendant Max Catto, a resident of London, England, which states in substance: He does not know the plaintiff, and prior to the proceeding herein he had never heard of her, nor heard of her manuscript, "No Alternative"; nor heard of a literary agent by the name of Ben Medford. He has had no contact or dealings with Ben Medford. He has never resided in or visited the State of California.

The photoplay script or dialogue continuity of the photoplay, "Trapeze," was filed by defendants as an exhibit at the hearing in the trial court.

In the deposition of Ben Medford, a literary agent called as a witness by plaintiff, he stated that he knew plaintiff by the name of Rena Castle; about 1948 she submitted the manuscript, "No Alternative," to him; he did not have a conversation with her about submitting the manuscript to Max Catto; he does not know Catto; he never submitted the manuscript to anyone, and he returned it to her.

In the deposition of James Hill, a producer of motion pictures, who was called as a witness by plaintiff, he stated that he did not know Ben Medford; he had met Max Catto once for approximately ten minutes, at a party in London; that meeting was in 1955; the motion picture, "Trapeze," was based upon the book, "The Killing Frost," by Max Catto; the manuscript, "No Alternative" (shown to him as a witness) is not familiar to him as any story that had been discussed or submitted to him.

A summary judgment proceeding with respect to an action involving a literary composition was reviewed in *Desny* v. *Wilder*, 46 Cal.2d 715 [299 P.2d 257]. According to the affidavit of Max Catto, the author of "The Killing Frost," he had never heard of plaintiff or her manuscript prior to this action, and had never heard of Medford. Plaintiff did not file an affidavit with respect to those statements by Catto or file any affidavit. Her deposition, however, was filed herein.

In a summary-judgment proceeding, a deposition may be treated as an affidavit in opposition to the motion. (*Desny* v. *Wilder, supra,* p. 725.) In her deposition she states that she gave the copy to Medford and he said he would give it to a writer to rewrite, and possibly he mentioned the name "Catto"; that she had not read the book, "The Killing Frost."

Plaintiff does not assert that she gave her manuscript to anyone other than Medford.

Medford states in his deposition that he does not know Catto, and he had not submitted the manuscript to anyone, but had returned it to her.

Mr. Hill stated, in his deposition, that the motion picture was based on the book, "The Killing Frost."

Plaintiff has not contradicted the statements of Catto or Medford regarding nonaccess to the manuscript, and has not shown by affidavit or deposition that there was a triable issue as to access.

Furthermore, a comparison of plaintiff's manuscript with the photoplay script shows that there is no substantial similarity between them.

A synopsis of the manuscript, "No Alternative" is as follows:

John Dolan, Jr., was a member of a famous trapeze family and had been performing with his parents from the age of 5. His mother had met accidental death while performing and his father had then left the show, but "Johnny Boy," as he was called, was devoted to the circus and the trapeze notwithstanding two serious accidents which he had barely survived. He was known as the greatest trapeze artist of his time.

As Johnny was finishing his act, his friend and fellow trapeze artist, Paul Collins, observed that he seemed unusually exhausted, and suggested that he take a vacation or quit the show, but Johnny resented the suggestion. Later Johnny failed to catch the trapeze, fell, and awoke in a hospital bed to find himself badly crippled, perhaps for life. His faithful friend Paul planned an ocean voyage for them, and soon they were sailing in tropic waters on a beautiful white liner under the command of Captain Skipper, an old friend of Johnny's family. After they sailed, Paul confessed to Johnny that this trip was not just a vacation, but was in reality a time lapse between the old loved circus life to which he could never return, and a new life. Johnny was shocked by these disclosures, but could not give up hope entirely that he might someday return to the circus.

On the deck, Johnny saw and fell in love with a beautiful dark girl whom he described to Paul. Paul met her later, and was told her story by Captain Skipper: that she was a descendant of gypsies who had long ago settled on a tropic isle and become its rulers; that her name was Thea, and she was one of three children—an older sister who had been lost in a storm at sea, a younger brother who was away from the isle most of the time, and Thea who ruled the island. Paul related this story to Johnny, who had been too ill from shock and love to attend the Captain's dinner.

The ship encountered a great storm which forced it off its course and finally into a small inlet where it was protected and sheltered. All passengers were ordered into lifeboats, Johnny and Thea being put into the same boat, and all the other lifeboats followed Thea's since she knew the islands thereabouts and her own island was nearby. On their arrival at her island, natives waded out into the surf to meet the lifeboats, and a crew was sent out to repair the liner.

Paul and Johnny were overcome by the peace and mystic qualities of Thea's luxurious abode, as they watched her court

as it paraded into the dining room in a colorful procession, singing a religious chant, and went to a marble table laden with exotic foods, presided over by the princess who was wearing a gold and white Grecian-style gown. Later she appointed Happo to look after them and to show them their lodgings.

The ship was made ready to sail in three months, but Johnny decided to remain there in the peace and quiet of seashore and jungle where he could forget his troubles and mend his crippled leg, and Paul decided to stay with him. The three of them, Paul, Johnny, and Thea, had many fishing trips and happy times together.

After two years, Johnny's health was completely restored, and he became restless, longing for the old circus life. He told Thea about his desire to leave, and asked her to marry him and go back with him, but although she loved him and wanted to go with him, she felt that she could not leave her people without a ruler. He pleaded with her to go but she could not, and since his first love was the trapeze, he had no alternative but to go back to it. After a passionate embrace they agreed to write each other, and he and Paul left the island.

As their ship sailed away, leaving a crowd on the beach waving farewell, Paul told him he was a fool for leaving her, and Johnny replied that she would come to him one day. They took with them the pets they had had on the island—two parrots and a monkey named Pepo, and on the voyage they talked about their experiences on the island.

On their arrival they made contact with their former circus manager, and a few weeks later they were performing on the trapeze in the circus again, teaming up with Karrol Roland, a girl who first liked Paul but later fell in love with Johnny.

As time passed, the letters between Johnny and Thea became fewer and further apart, and finally ceased entirely. Johnny then asked Karrol to marry him, she accepted, and they had a happy marriage for seven years, during which time they had a son, "Little John," who inherited his father's appearance and love for the circus.

When Little John was 5 years old, he and Uncle Paul were walking toward the arena to watch Karrol and Johnny perform on the trapeze when Paul saw a beautiful young woman approaching them whom he recognized as Thea. They rejoiced at meeting, and Paul introduced Little John, telling

her about Johnny's happiness in his marriage to Karrol, but as they started forward to watch the act they heard the ominous sounds of tragedy—the silence, the uproar, and later the screaming ambulance sirens. They hurried on and when they arrived at the scene they found that Karrol had died instantly and Johnny was unconscious. He recovered consciousness for a few moments, asked about Karrol and was told she was all right, and he asked Paul to look after Karrol and Little John. Johnny then recognized Thea, and after a tender reunion with her, he died. Paul and Thea wept in each other's arms. Johnny had left a son to follow in his footsteps.

A synopsis of the photoplay, "Trapeze," is as follows:

In the motion picture "Trapeze," all of the action takes place in a circus in Paris.

Mike Ribble (played by Burt Lancaster) formerly was a great trapeze artist, the only living man who had done a triple somersault on the trapeze, but who had fallen in the act and now was a cripple walking with a cane, and employed in the circus as a rigger, setting up the platforms, guywires, and swings for trapeze acts.

Tino Orsini, a trapeze performer from Brooklyn, arrives at the circus seeking Mike, since Tino's father has told him that Mike is the only man who can teach him to do the triple. Tino finds Mike and pleads with him to teach him the triple, and Mike finally consents, thereafter instructing and rehearsing Tino, and with himself acting as catcher.

Lola, a beautiful but selfish and self-centered acrobat (played by Gina Lollobrigida) deserts her three fellow-acrobats, breaking up their act, so that she can maneuver herself into the trapeze act of Mike and Tino. She carries on love affairs with both men, making trouble between them.

John Ringling North visits the circus, hoping to find new acts for his New York Barnum and Bailey Show. He is watching the trapeze act when Tino and Mike engage in a fight over Lola, high overhead on a platform of the trapeze at the top of the tent. Tino strikes Mike and Mike then taunts Tino into attempting the triple. Tino tries it and succeeds, Mike catching him. Tino thereupon becomes a great hero of the trapeze, with photographers and newsmen crowding about congratulating him. North signs him up for his show, but Mike declines to go along as catcher, although he instructs another catcher for the act. Mike then leaves the circus, Lola going with him.

The entire atmosphere of the picture is that of the circus. Other circus acts and people make a background for the story: a dwarf clown with a broom; a snake-man with several huge pythons; a lion which gets loose and causes consternation; a giraffe, a monkey; elephants; ballet dancers; a four-horse act put on by Rosa, who is a former wife of Mike, and her husband; acrobats and jugglers, circus music and a parade. (This is the end of the synopsis.)

There is almost no similarity between the story "No Alternative" and the picture "Trapeze." The hero of each is a young trapeze artist, but in the story he has already achieved success and survived a crippling accident, only to make a comeback in which he is killed, while in the picture the star is striving toward and achieving success in making a triple-somersault on the trapeze, and there is no tragic accident to mar his accomplishment. The accident in the picture has already crippled the star's teacher, an older man.

In the story there is a long period of recuperation from a crippling accident in a mystic tropic island where a love affair develops between the hero and the ruling princess, a noble and lovely person. The hero turns aside from love to return to his greater love, the trapeze. In the picture, however, the star is infatuated with a selfish, ignoble acrobat, whom he loses eventually to his crippled teacher.

In the story there is very little circus atmosphere, while in the picture there is nothing but circus atmosphere and background.

There are two leading men in both the story and the picture, but in the story the hero is the cripple, with the other man always secondary. In the picture, both men have almost equal starring roles, although at the end the younger achieves the success he strives for and the cripple wins the girl.

The heroine in the story is noble, unreal, and apart from the circus until the final scene, but in the picture the heroine is selfish, ignoble, disloyal, scheming, and a part of all the action in the picture.

There is no real triangle in the story, although the secondary man feels admiration for the heroine, and after the final fatal accident they appear to find solace in each other. In the picture there is a definite triangle with kissing and embracing between the girl and both men.

Although both story and picture deal with two men especially, their personalities and relationships are entirely dissimilar. In the story the two men are young and true friends over

many years, with great affection and loyalty toward each other. In the picture, by contrast, one man is young and the other much older, while their relationship is recent, of short duration, and marred by bickering, jealousy, and actual fighting.

The similarities between the story and the picture are few. Each deals with a great trapeze artist who feels a compulsive love for the trapeze, and each has a girl join the trapeze act with two men, but there is no triangle relationship in the story, while there is a very sordid triangle in the picture.

The theory of plaintiff's action is an alleged infringement of her alleged common law property right.    Plaintiff has no protectible interest in the matter of writing on the general subject of the circus, trapeze performers, compulsive love for the circus, or involvement in a love triangle.    In *Weitzenkorn* v. *Lesser*, 40 Cal.2d 778, 789 [256 P.2d 947], it was said: "The Legislature has abrogated the rule of protectibility of an idea and California now accepts the traditional theory of protectible property under common law copyright."    Whether plaintiff herein "has a protectible property interest depends upon the originality of form and manner of expression, the development of characterizations and sequence of events." (See *Weitzenkorn* v. *Lesser, supra*, p. 789.)

Rules regarding a summary judgment are stated in *Desny* v. *Wilder, supra*, 46 Cal.2d 715, 725-726 [299 P.2d 257].)

   In the summary judgment proceeding herein a triable issue of fact has not been presented.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 23, 1963.