SYLVIA ROBERTS, Plaintiff-Appellant, *v.* ARLENE DAHL *et al.*, Defendants-Appellees.

(No. 55927;

First District—June 28, 1972.

*Rehearing denied July 26, 1972.*

DIERINGER, P. J., dissenting.

Horwitz, Anesi, Ozmon & Associates, Ltd., of Chicago, (Nat P. Ozmon and Anthony J. Bosco, of counsel,) for appellant.

Granger Cook, Jr. and Raymond P. Niro, both of Hume, Clement, Hume & Lee, Ltd., of Chicago, for appellees.

Mr. JUSTICE BURMAN delivered the opinion of the court:

Plaintiff, Sylvia Roberts, appeals from a summary judgment entered in favor of defendants, Arlene Dahl *et al.*, in an action to recover damages for the infringement of a common law copyright in certain unpublished scripts for a television series on beauty hints. In addition to Miss Dahl, defendants are: American Broadcasting Companies, Inc., the broadcaster of the allegedly infringing television show; Clairol, Inc. and Clairol, a division of Bristol-Myers Co., the sponsors of the show; Foote, Cone & Belding, Inc., the advertising agency for Clairol; Ruder & Finn of Chicago, Inc., a public relations firm of which Clairol was a client; Gamut Productions, the producer of the allegedly infringing television series and Victor Morris.

Plaintiff, who resides in Chicago, Illinois, alleged in her complaint that prior to March 28, 1966, she created a series of television scripts entitled "The Beauty Spot"; that the scripts were her original creation

and of substantial value to her; that she never published or consented to the publication of the scripts; that prior to March 28, 1966, the defendants come into possession of the detailed contents of the scripts without the knowledge or consent of plaintiff, and that on March 28, 1966, and for approximately sixteen weeks subsequent thereto, defendants caused substantially similar scripts to be published on a nationwide television show known as "Arlene Dahl's Beauty Spot". Plaintiff further alleged that as a direct and proximate result of the acts of defendants, she had been deprived of her literary property, and prayed for $500,000 damages. The defendants filed answers denying plaintiff's charges.

The record reveals that plaintiff, Sylvia Roberts, is an accomplished beauty and fashion consultant, a former model and an expert in the field of cosmetics and hairstyling. She has appeared on several television shows and has traveled throughout the United States as a fashion and modeling consultant. Plaintiff has been employed by various large cosmetic manufacturers, has held executive positions at the Patricia Stevens School for Models in Chicago, and has had experience in both copywriting and script work. She testified on deposition that she studied advertising, journalism, drama and television writing at Northwestern University. Miss Roberts has been involved in the field of fashion and beauty consultation for approximately twenty years.

Plaintiff stated that in 1960, she began to think about a television series involving beauty hints for women. By April, 1963, she had completed several scripts and had conceived of the idea of calling her series "The Beauty Spot." In July, 1964, plaintiff met defendant, Victor Morris in Detroit. Morris was a frequent visitor in her home until the fall of 1965. Plaintiff testified that Victor Morris saw her scripts at least a dozen times and that she had discussed the format and outline of the show with him.

In September, 1965, Morris was employed by defendant, Ruder & Finn, a public relations agency which represented defendant Clairol. In his deposition, Morris testified that he had never worked on the Clairol account. He stated that Miss Roberts told him of her idea for a television beauty show, but denied ever seeing plaintiff's scripts or knowing where she kept them. When plaintiff asked him in 1966 if he had ever spoken to anyone at Ruder & Finn about her idea for a television series, he assured her that he had not.

Defendant, Arlene Dahl, a resident of Hollywood, California, is the movie and television personality featured on the "Beauty Spot" television show broadcast on ABC-TV from March 28, 1966, to June 24, 1966. Her affidavit discloses that she has been active in the beauty consulting field for the past fifteen years and has become known as a beauty and fashion

expert. Since 1954, she has written syndicated feature articles dealing with a variety of beauty tips for women. In 1960-61, Miss Dahl began began working on a book, "Always Ask a Man—The Key to Femininity," which was published by Prentice-Hall in 1965. In 1962, she began giving beauty clinics for women in which she offered advice and counsel on beauty and fashion, using women from the audience as models.

In April, 1965, Arlene Dahl conceived of the idea of a television show featuring her beauty consulting services and disclosed the idea and format to Noel Rubaloff, her agent. She and Rubaloff contacted defendant, Gamut Productions, which taped a beauty clinic given by Miss Dahl in San Francisco in June, 1965. From the tape, Gamut made five 30-minute shows which were telecast in San Francisco on station KGO-TV. From the five 30-minute shows, a single 30-minute pilot film was made. Television networks, television stations and advertising agencies were contacted. In June or July, 1965, defendant Dahl's show was presented to Foote, Cone & Belding, an advertising agency whose clients included defendants Clairol and Clairol, a division of Bristol-Myers. Foote, Cone & Belding was not interested in the half-hour format, but was interested in a five-minute format. In December, 1965, defendant Foote, Cone & Belding bought Miss Dahl's beauty program, comprising 65-five-minute shows. Various topics were selected from defendant's syndicated newspaper articles and from her book. These topics were submitted to Foote, Cone & Belding, which made the final selection. The scripts were written between January and March, 1966, by the same writers Miss Dahl had used to help her write her newspaper features and her book. From March 28 through June 24, 1966, defendant's television shows were broadcast on ABC-TV.

Miss Dahl's account of the development of her television program was substantially corroborated by the affidavits of Noel Rubaloff, her agent; Richard Gottlieb, a principal in Gamut Productions; John Owen, Vice President and Director of Broadcast for Foote, Cone & Belding; Jack Shor, Vice President and Director of Public Relations for Clairol; David Sacks, General Manager of KGO-TV, and James Shaw, a sales account executive at ABC.

In her affidavit, Miss Dahl further stated that since 1946 she has used a beauty spot and lip imprint as her personal "logo" and that she first used the name "Beauty Spot" on her syndicated feature articles in 1963. It was her idea to use the same name for the television program in order to continue her personal "logo". She also asserted that prior to the filing of this action, she was never aware of the existence of Sylvia Roberts or of Miss Roberts' idea for a television show. Nor was she aware of the existence of Victor Morris. She stated that her television series was

conceived solely by her and developed completely independently of and without knowledge of Sylvia Roberts' idea or scripts. She also asserted that the idea and format for the Arlene Dahl beauty show was original with her and in no way derived from either Sylvia Roberts or Victor Morris, and that the format was substantially identical to that which she had used in her beauty clinics throughout the United States. In their affidavits, Richard Gottlieb, Jack Shor, John Owen, Noel Rubaloff, David Sacks and James Shaw, each denied being aware of the existence of either Sylvia Roberts or Victor Morris, and stated that to the best of the affiant's knowledge, the Arlene Dahl television beauty show was created and developed by Arlene Dahl independently of and without knowledge of Sylvia Roberts' idea or scripts.

Harry F. Hunter testified on deposition that he was employed by the firm of Ruder & Finn from 1957-1970 as Vice President and General Manager of the Chicago office, and that he hired Victor Morris in September of 1965 as account executive. In his affidavit, Hunter stated that Morris was under his supervision and that at no time did Morris report to anyone but him. He also asserted that Morris had never had contact with the Clairol account. He said, "in fact, the Clairol account was serviced exclusively from the New York office." Hunter stated that prior to the filing of this lawsuit, he was unaware of the existence of Sylvia Roberts or of her idea for a television beauty series.

Dee Granger testified on deposition that she was employed by the firm of Ruder & Finn from 1964-1970 as an account executive. From 1964-66, she worked on the Clairol account, including the Clairol Color Carousel, a massive promotion at the Randhurst Shopping Center. She testified that Victor Morris had driven her to the Randhurst Center in a company car because he had an account located beyond Randhurst, but she denied being aware of the existence of Sylvia Roberts or of her idea for a beauty show prior to the filing of this lawsuit.

The trial court considered the entire record, including the pleadings, depositions of the respective parties, and affidavits of the defendants. In granting summary judgment to the defendants, it held, in a comprehensive memorandum opinion, that Miss Dahl had independently developed her scripts without the benefit of plaintiff's ideas or scripts. Furthermore, the court found that Miss Dahl and the persons who assisted her did not have access to plaintiff's scripts, and that there was no evidence that Victor Morris had disclosed the contents of plaintiff's scripts to anyone involved in developing Arlene Dahl's television series. The court went on to say that, "Where, as here, there is clear evidence of 'independent development' and no 'access', summary judgment must be granted." Although the court noted that because of the foregoing

conclusions, any discussion of the similarities between the two sets of scripts was moot, it asserted that a side-by-side comparison of plaintiff's scripts with those of defendant, revealed that much of what was common was either old and therefore in the public domain or was the subject of Miss Dahl's proprietary rights in her own published works. Specifically, the court found that nearly all the similar language could be found in Miss Dahl's book, "Always Ask a Man—The Key to Femininity," which was published before Victor Morris was employed at Ruder & Finn; that Miss Dahl had written syndicated newspaper articles on the identical subjects covered in plaintiff's scripts long before plaintiff claims she authored her scripts, and that much of the language in plaintiff's scripts was part of the routine phraseology used in the beauty consulting field.

Plaintiff contends that summary judgment was improperly entered in this case because there are issues of material fact which should have been determined by a jury. She argues that whether the two sets of scripts are substantially similar, whether defendants had access to plaintiff's work and whether defendants copied from plaintiff, are issues of fact. Defendants counter that there is no genuine issue as to any material fact and that they are therefore entitled to judgment as a matter of law. They contend that no amount of similarity between two literary works can give rise to an inference of copying when the undisputed facts show that the allegedly appropriated material was independently developed. Defendants claim further that plaintiff's access argument is based on unsupported speculation and that there is no evidence that the similarities in the scripts are the result of anything other than the nature of the subject matter of Miss Dahl's use of her own earlier published materials.

The record establishes that plaintiff did have a common law copyright in her scripts since she had not published them or consented to their publication. For purposes of their motion for summary judgment, defendants did not contest plaintiff's ownership of the scripts.

Illinois courts have not been the forum for extensive copyright litigation. Plaintiff's counsel states that he is unaware of an Illinois case which disposes of the precise questions before us on this appeal, other than those dealing in general with the propriety of summary judgment. Both parties have cited numerous opinions on the subject of copyrights from other jurisdictions.

██ Plaintiff recognizes that the basic legal proposition which she must establish in order to sustain her action for common law copyright infringement is proof of copying by defendants. She argues that copying is often impossible to establish directly. Therefore, the cases have established the rule that an inference of copying arises upon the showing of

a substantial similarity between the two works and access to plaintiff's work by the defendants. Where there is strong evidence of substantial similarity, a lesser showing of access will suffice. Conversely, if the evidence of access is weak, stronger proof of substantial similarity will be required. Moreover, access can, in some cases, be inferred from substantial similarities. *Arnstein v. Porter,* 154 F.2d 464; *Christie v. Harris, et al.,* 47 F.Supp. 39, aff'd. 154 F.2d 827; *cert.* den. 329 U.S. 734; *Golding v. RKO Pictures,* 221 P.2d 95; *Kovacs v Mutual Broadcasting System,* 221 P.2d 108.

■■ In the field of common law copyright, however, the concept of copying coexists with a related legal concept known as independent development. As stated by Judge Learned Hand in *Fred Fisher, Inc.* v. *Dillingham,* 298 F. 145, 147.

"* * * the law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted."

The record reveals that Arlene Dahl's use of a beauty spot and lip imprint as her personal logo, the publication of her newspaper articles, the initial work on her book, and her beauty clinic activities all took place long before any personal relationship developed between plaintiff and Victor Morris. Moreover, Miss Dahl had conceived the disclosed her idea and format for a television program, the five 30-minute tapes were broadcast on KGO-TV and the Arlene Dahl beauty show concept was presented to Foote, Cone & Belding before Morris was employed by Ruder & Finn.

■■ As stated in *O'Rourke v. RKO Radio Pictures,* 44 F.Supp. 480, 482, "* * * even an exact counterpart of another's work does not constitute plagiarism, providing that such counterpart was arrived at independently and without in fact resorting to the other's work." In the instant case, the uncontradicted affidavits of the defendants establish that the Arlene Dahl television beauty program was developed independently and without knowledge of plaintiff's work. Thus, even if plaintiff on defendants' motion for summary judgment presented sufficient evidence of similarity and access to raise an inference of copying, that inference was necessarily dispelled by defendants' uncontradicted evidence of independent development. (*Teich v. General Mills, Inc.,* 339 P.2d 627.) Where a defendant interposes an absolute defense involving no triable issue of fact, the court may enter summary judgment in his favor. *Rock Finance Co. v. Central Nat. Bank,* 339 Ill.App.319, 89 N.E.2d 828.

■■ We agree with the court below, however, that the evidence of similarity and access presented by plaintiff was insufficient to raise an

inference of copying. On the matter of access, it is uncontested that plaintiff informed Victor Morris of her idea and scripts for a television show on beauty counseling. Plaintiff contends that Victor Morris, as an employee of Ruder & Finn, initiated a chain which eventually led to the disclosure of her idea and the contents of her scripts to Arlene Dahl. As the trial court pointed out, however, there is no evidence that Morris disclosed or communicated his knowledge of plaintiff's idea and scripts to anyone. Plaintiff stated on deposition that Arlene Dahl came into possession of the detailed contents of her scripts, but when pressed to be more specific, she admitted that she did not know when, under what circumstances, or to whom Morris had disclosed this information. When asked if she had any tangible evidence that Morris had transmitted the contents of her scripts to Arlene Dahl, plaintiff replied, "The scripts themselves."Conversely, those individuals responsible for writing and producing the Arlene Dahl scripts all stated on affidavit that they had no knowledge of Victor Morris or plaintiff, or of plaintiff's idea or scripts for a television beauty program.

■■ It is well established that the courts will not engage in speculation or conjecture in order to make a finding of access. (*Alexander v. Irving Trust Co.*, 132 F.Supp. 364, affd. 228 F.2d 221; *Sarkadi v. Wiman*, 43 F.Supp. 778, affd. 135 F.2d 1002.) Moreover, the courts have refused to find access where, as here, the uncontroverted evidence of the persons directly involved in the preparation of defendant's work was that they had never seen or heard of plaintiff's scripts. (*Lapsley v. American Institute of Certified Public Account.*, 246 F.Supp. 389; *Columbia Pictures Corporation v. Krasna*, 65 N.Y.S.2d 67.) Thus in *Lapsley*, Judge Sirica, granting defendant's motion for a directed verdict on the ground that no evidence of access had been presented, noted,

"As indicated earlier, the defendant corporation had access to the plaintiff's manual when it was submitted to its employee, Mr. Hickey. However, the plaintiff has introduced no evidence tending to show that the persons directly involved in the preparation of the defendant's publications had ever seen or heard of the plaintiff's manuscript. In fact, the persons who wrote the defendant's publications testified that they had neither seen nor heard of the plaintiff's material until after they had completed their assignments for the defendant." 246 F.Supp. 389, 390.

In *Jacobs v. Hill*, 26 Cal.Rptr. 591, plaintiff brought an action for damages for infringement of her common law copyright in a literary composition. Defendants filed a motion for summary judgment on the grounds

"(1) that as a matter of law there is no similarity between plaintiff's

manuscript and anything in the alleged infringing production, (2) that none of the defendants, except Medford [a literary agent], had access to the manuscript and that Medford had nothing to do with the creation of the alleged infringing production; and, therefore, there is no triable issue of fact and the action has no merit." 26 Cal. Rptr. 591, 592. The Appellate Court, affirming the trial court's entry of summary judgment for defendants, stated,

"Plaintiff has not contradicted the statements of Catto [author of the alleged infringing script] or Medford regarding non-access to the manuscript, and has not shown by affidavit or deposition that there was a triable issue as to access." 26 Cal. Rptr. 591, 593.

■■ Plaintiff stresses that proof of substantial similarities can in some cases give rise to an inference of access. ( *Kovacs v. Mutual Broadcasting System,* 221 P.2d 108.) She has presented to this court a side-by-side comparison of both sets of scripts in an effort to show substantial similarities. We have also been presented by defendants with a side-by-side comparison of Arlene Dahl's scripts with her book entitled "Always Ask A Man—The Key to Femininity," which was published in May, 1965. We find virtually all of the similar language relied on by plaintiff can be found in Miss Dahl's book. In addition, Miss Dahl had been writing syndicated newspaper articles on the identical subjects covered in plaintiff's scripts long before plaintiff claims she authored her scripts. Moreover, certain descriptive words claimed by plaintiff to be original are but the routine phrases commonly used in the beauty consulting field. The inference of copying does not exist "where the similarity between the two works arises because of the nature of the subject matter and the fact that both authors used materials available to all." *Greenbie v. Noble,* 151 F.Supp. 45, 68.

■■ Plaintiff claims that substantial similarity is a fact issue which cannot be decided as a matter of law. ( *Kovacs v. Mutual Broadcasting System,* 221 P.2d 108; *Golding v. RKO Pictures, Inc.,* 221 P.2d 95; *Stanley v. Columbia Broadcasting System,* 221 P.2d 73.) Plaintiff fails to note, however, that in *Weitzenkorn v. Lesser,* 256 P.2d 947, the Supreme Court of Californial specifically considered the *Kovacs, Golding* and *Stanley* decisions, and determined that the question of similarity could be dealt with as a matter of law. There the court stated,

"* * * whether there is any question to present to the trier of fact is, in the first instance, a question of law.

* * *

Having both productions before it * * *, the court may determine whether there is substantial similarity between them. If, as a matter

of law, there is no such similarity, no question of fact is in issue and the demurrers to each count of the complaint were properly sustained." 256 P.2d 947, 956-7.

Similarly, in *Gethers v. Blatty*, 283 F.Supp. 303, Judge Whelan granted defendants' motion for summary judgment, stating,

"The issue before the Court on such motion is: is there substantial similarity between plaintiff's play and Blatty's novel? This Court answers the question in the negative; thus as a matter of law defendants are entitled to summary judgment." 283 F.Supp. 303, 305.

Plaintiff in the instant case neither filed supporting affidavits nor took depositions of witnesses she believed could refute the defense of independent development.

■■■ She filed no affidavits to support her allegation that Mr. Morris disclosed the contents of her scripts to any of the defendants. She filed no affidavits of persons who could even substantiate the existence of her unpublished scripts. Thus there is simply nothing of record that could be considered to link plaintiff's disclosure to her friend, Mr. Morris, with any of the persons actually responsible for the creation, writing and production of Arlene Dahl's scripts. As stated in *Pefferle v. Prairie Mills, Inc.*, 72 Ill.App.2d 440, 443, 218 N.E.2d 247, 249, "Where the movant in support of his motion [for summary judgment] supplies facts which, if uncontradicted, entitles [sic] him to judgment, the opposing party cannot rely alone on his complaint or answer even though the complaint and answer standing alone do present a genuine issue of a material fact."

We reject plaintiff's contention that the Circuit Court erred in accepting the truth of defendants' affidavits. Plaintiff argues that since each affiant was substantially interested in the outcome of this litigation, the credibility of each was a question of fact which should have been submitted to a jury. Plaintiff, however, did not seek to challenge the credibility of the defendants' witnesses although there was ample time to do so. Her argument, if accepted, would mean that the summary judgment procedure in Illinois could only be used when the moving party relied solely on documentary evidence. This theory, however ignores Supreme Court Rule 191, ch. 110A, Ill. Rev. Stat. 1967, par. 191, which prescribes standards for affidavits in summary judgment proceedings.

■■ The right to summary judgment is established by statute to enable the court to dispose of a case in a speedy and inexpensive manner when there is no genuine issue of material fact to be resolved. (ch. 110, Ill. Rev. Stat. 1967, par. 57.) Of course it is error to deny a trial when there remains a genuine dispute as to a material fact, but it is likewise error to postpone judgment when the ultimate legal result is clear. For the

reasons stated in the opinion, we find that there was no genuine issue of material fact in the case at bar. Therefore, the trial court properly sustained defendants' motion for summary judgment.

Judgment affirmed.

ADESKO, J., concurs.

Mr. PRESIDING JUSTICE DIERINGER dissenting:

I respectfully dissent to the holding affirming summary judgment in favor of the defendants. I believe the impact of the majority opinion will foreclose the right to trial by jury in copyright cases.

In conjunction with the facts mentioned in the majority opinion, the following are pertinent.

Miss Roberts' television scripts for the five minute segments were completed prior to April, 1963, at which time a pilot television tape of these segments was made. For the purposes of this appeal, defendants have admitted that Miss Roberts' scripts were original and were authored and owned by Miss Roberts. Also, there is no dispute concerning the contents of the plaintiff's scripts.

Miss Roberts' scripts for these segments were about one page of single space type, each containing dialogue, camera directions, theme song choice, opening logo, and time allotment. There were six scripts.

Miss Roberts testified on deposition that she kept her scripts in a white cabinet in her apartment. Defendant Victor Morris became acquainted with Miss Roberts in 1964 and thereafter became a regular visitor to her home. Admittedly, he had regular access to the plaintiff's apartment, both when the plaintiff was home as well as when she was not. Miss Roberts testified that Morris saw her working on her scripts from time to time and actually viewed the scripts themselves. Morris admitted having discussed the idea for the TV show with the plaintiff, and that he knew of the pilot tape of her series. In August of 1965, Morris, who had previously been active in advertising and public relations, secured employed with the Chicago office of Ruder & Finn, which represented the Clairol account in Chicago. A regular working relationship existed between the defendant Clairol and the Chicago office of Ruder & Finn, whose chief executive assigned to the Clairol account was in New York. Ruder & Finn's Chicago office directed numerous Clairol activities, including "a rather massive promotion" during the summer of 1966. The Ruder & Finn account executive in charge of the Chicago based Clairol promotion had direct contact with the Clairol Account Supervision in New York as well as direct personal contract with the defendant Morris, who also on occasion traveled to New York on busi-

ness for Ruder & Finn. The head of Ruder & Finn also admitted that the Clairol account was frequently serviced out of the Chicago office.

Morris admits this in his deposition and says he went to work for Ruder & Finn in September 1965. He said he knew about plaintiff's script and the taping of the show in Milwaukee, but denied telling anyone in his organization about it. How many other people he knows in the advertising field or in show business or if he talked to them is not disclosed.

Turning now to Miss Dahl's works. In April, 1965 (two years after Miss Roberts' segments had been completed), Miss Dahl conceived of a television show featuring her beauty consulting services. Miss Dahl taped five 30-minute shows, which were later discarded. In December of 1965 (four months after Morris joined Ruder & Finn), the 5-minute format was selected by the New York advertising firm of Foote, Cone & Belding, for use on behalf of their client, the defendant Clairol. It is also noteworthy that Ruder & Finn was the public relations firm for Foote, Cone & Belding and that there was considerable contact between personnel of the two firms. The scripts for Miss Dahl's 5-minute segments were written during January-March, 1966, by the same writers who had helped Miss Dahl write her book (published in 1965) entitled "Always Ask A Man—The Key To Femininity."

The majority opinion refers to Arlene Dahl's scripts with her book published in May, 1965, and says the language is similar. This applies to the general ordinary language, but does not explain the ten verbatim quotes from the plaintiff's script which appear in the Dahl script as follows:

"1. Is your face your fortune?
2. The darker shade should never be * * *.
3. You apply the darker foundation * * *.
4. So there is no line of demarcation.
5. Remember * * *. No matter how busy you are, take time for beauty. (repeated at the close of each script)
6. Bed time.
7. * * * The boudoir.
8. * * * It's really your fault if your husband
9. Today we are going to concentrate on eyes
10. We are going to apply an eyeliner."

Every word in every sentence appears in exactly the same form in defendants' script and can hardly be called accidental or a coincidence. Furthermore, there are 43 instances of similar sentences of clauses appearing in plaintiff's script that also appear in defendants' script. In addition, the similarities of format must be noted as follows:

TIME:
Both shows are 5 minutes in length
OPENING BILLBOARD:
Both shows open with camera closeup of "Beauty Spot" logo
OPENING SHOT:
Both shows open with short introduction by star (Miss Roberts or Miss Dahl) followed by a commercial.
BODY OF SHOW:
Both shows have a body of dialog of about 3½ minutes
MUSIC:
Both shows end with the same theme song.
FINAL REMARK:
Both shows are ended with the identical remark made by the stars, "Remember ladies, no matter how busy you are, take time for beauty."
TIME SLOT:
Both shows were to be programmed for a mid-day audience, to be presented 5 days a week. Defendants' show was actually aired at 11:55 A.M.

Again, this format appearing in plaintiff's work, later is used on defendants' show.

A comparison between the six one-page scripts of Miss Roberts with the scripts of Miss Dahl reveals astonishing similarity. The plaintiff has demonstrated fifty-three separate examples of either identical or substantially identical excerpts. When we consider that these fifty-three examples of identical or substantially identical language occur in as few as six pages of script, one is inescapably led to the conclusion that there could be a closer connection than mere coincidence and customary phraseology within the industry. In addition to identical words and phraseology, the scripts appear similar in exact continuity, sequence of thought and presentation. This even includes the same opening logo, the same closing remarks and the same theme song.

Although defendants argue that some of the language contained in Miss Dahl's scripts is also contained in her book (which was written, in part, by the same writers who collaborated in Miss Dahl's television scripts and was published after Miss Roberts' scripts were written) the argument is not convincing. For one example, it does not explain where (if not from Miss Roberts' scripts) Miss Dahl obtained the "key phrase," used at the end of each of Miss Dahl's segments: "In the meantime, remember no matter how busy you are, take time for beauty." This "key phrase" admittedly does not appear in Miss Dahl's books or other works. This "key phrase" does appear in Miss Roberts' scripts, written some two

years before Miss Dahl's. Neither does it explain that concurrent with defendants' change from a half-hour show to a five-minute segment there was a title change from "Let's Be Beautiful" to "Beauty Spot." This is the title of Miss Roberts' originally conceived five-minute show. Nor does it explain that this significant change took place after Morris' association with Ruder & Finn.

Bearing in mind that Miss Dahl's book was copyrighted in 1965, two years after Miss Roberts' TV scripts, the book would not support defendants' claim to originality. Miss Dahl's book consists of 209 pages, each page having approximately 35 to 40 lines of print. It would be strange indeed, considering the mass of verbiage, if some of the language did not appear in the book.

On the other hand, the numerous and striking similarities (not only in language and syntax, but in order and treatment of ideas and sequence and manner of expression as well) between Miss Roberts' six one-page scripts and Miss Dahl's scripts, casts extreme doubt if not impossibility upon defendants' claim that the similarities arise by coincidence or independent creation.

Defendants argue vehemently that plaintiff has not shown their access to the Roberts' scripts. However, in so arguing, they overlook Morris' admitted access to them as well as his relationship to the other defendants. A jury would be entirely justified in finding that defendants, and each of them, had access to the contents of the scripts through Morris, who was employed by the public relations firm of Clairol, whose product Miss Dahl was advertising. The jury would not be required to believe the self-serving and subjective denials of knowledge of defendants and their agents.

Turning now to the applicable law.

Summary judgment can be entered only when there is no genuine issue as to any material fact. It should not be entered where to do so would require the trial judge to decide controverted questions of fact. *Borgeson v. Fairhaven Christian Home* (1971), 1 Ill.App.3d 323; *Giampa v. Sunbeam Corp.* (1966), 68 Ill.App.2d 425.

In determining the right to summary judgment, all doubts must be resolved against the moving party. (*Breen v. Peck* (1958), 28 N.J. 351, 146 A.2d 665.) The burden of proof is on the moving party. (*Monmouth Lumber Co. v. Indemnity Ins. Co. of N. America* (1956), 21 N.J. 439, 122 A.2d 604.) There is no burden on the plaintiff, upon a motion for summary judgment by the defendant, to establish his entire case by depositions and affidavits. (*Champlin v. Oklahoma Furniture Mfg. Co.* (1959), 269 F.2d 918 (10th Cir.).) The purpose of summary judgment procedure is not to try an issue of fact, but rather to determine whether

there is an issue of fact. *Moroni v. Gulf, Mobile and Ohio R.R. Co.* (1967), 86 Ill.App.2d 426; *Frick v. O'Hare-Chicago Corp.* (1966), 70 Ill.App.2d 303.

The majority opinion says the defendants' affidavits are uncontradicted. All they do is deny the allegations in the complaint and the plaintiff is not required to deny a denial to create an issue of fact. The majority opinion also says the plaintiff's argument that the credibility of each affiant is a jury question ignores Supreme Court Rule 191. That statement, in my opinion, is incorrect. The rule states: "Affidavits shall not consist of conclusions, but of facts admissible in evidence." The affidavits were self-serving and as to those parts relating to affiants' co-workers was hearsay. How much are facts that are admissible in evidence is decided at the trial by the trial judge when the testimony is offered. The credibility of the witness is determined by the jury, after cross-examination. The affiants are interested parties; therefore the plaintiff has the right to have their credibility judged by a jury. In *Sartor, et al. v. Arkansas Natural Gas Corporation* (1944), 321 U.S. 620, the United States Supreme Court said:

"It may well be that the weight of the evidence would be found on trial to be with defendant. But it may not withdraw these witnesses from cross-examination, the best method yet devised for testing trustworthiness of testimony. And their credibility and the weight to be given to their opinions is to be determined, after trial, in the regular manner."

Recently the Illinois Appellate Court, in *State Farm Mutual Auto. Ins. Co. v. Short* (1970), 125 Ill.App.2d 97, in reversing a summary judgment, discussed the principles involved and the use of supporting affidavits. On page 106, the court said:

"A judge may not, on a motion for summary judgment, draw fact inferences. Such inferences may be drawn only on a trial. Cross v. United States, 336 F.2d 431, 433; Empire Electronics Co. v. United States, 311 F.2d 175, 180."

On page 107, the court said:

"Clearly these affidavits are admissible to impeach Loren's testimony and the question of Loren's credibility is raised. Under these circumstances summary judgment is inappropriate. Cross v. United States, supra, Arnstein v. Porter, 154 F.2d 464. Courts cannot overestimate the importance of having the witness examined and cross-examined before the court and jury."

On page 108, the court also said:

"The right of the moving party to summary judgment must be free from doubt. Miller v. Owens-Illinois Glass Co., 48 Ill.App.2d 412, 199

N.E.2d 300. The affidavits filed in support of a motion for summary judgment will be strictly construed and must leave no question of the movant's right to judgment, but the affidavits filed in opposition thereto will be liberally construed. Tansey v. Robinson, 24 Ill.App.2d 227, 164 N.E.2d 272."

In my opinion, summary judgment should not be granted in favor of the defendants because, to say the least, factual issues are present in regard to the following elements of the case, among others: substantial similarity between the scripts of plaintiff and defendants; defendants' access to plaintiff's scripts; credibility of witnesses and defendants' alleged independent development.

Copying is often impossible to establish directly. It would be absurd to hold, as a prerequisite to recovery, that a plaintiff must produce a witness who actually saw the very act of defendants' copying or require an admission from defendants that they copied the work. To require by affidavit a denial of a denial would be equally absurd.

The plaintiff has a right to prove her allegations by circumstantial evidence. There is no question circumstantial evidence is competent evidence in that circumstantial evidence, like any evidence, depends on its tendency to prove an ultimate fact in issue. (*Ladd v. Ruck* (1969), 108 Ill.App.2d 379.) Where there is no eyewitness, a fact in issue may be proved by circumstantial evidence; such evidence consists of proof of facts and circumstances from which the court may infer other connected facts which usually and reasonably follow. (*Golden v. Big Bear Foods, Inc.* (1968), 102 Ill.App.2d 237.) In a summary judgment proceeding it is not the function of the motion judge to weigh the evidence as was done in the instant case, and is being concurred in by the majority opinion here.

The common law copyright cases have established that an inference of copying can be established by a showing of substantial similarity and access (both of which plaintiff had demonstrated). Going even further, the cases hold that, in some situations, access itself can be inferred from substantial similarities. *Christie v. Harris* (1942), 47 F.Supp. 39, aff'd. 154 F.2d 827, cert. den., 329 U.S. 734; *Arnstein v. Porter* (2d Cir., 1946), 154 F.2d 464; *Golding v. RKO Pictures* (1950), 35 Cal.2d 690, 221 P.2d 95; *Kovacs v. Mutual Broadcasting System* (1950), 99 Cal. App.2d 56, 221 P.2d 108.

The point is demonstrated in *Kovacs v. Mutual Broadcasting System*, 221 P.2d 108, as follows:

"There was no direct evidence of access. Defendants denied access and copying. Access may, however, be proved indirectly. A charge of piracy does not fail merely because the infringer was not caught in the

act of copying. Access may be inferred from the surrounding circumstances or it may be found from similarities in the plan, arrangement, and combination of the materials, or from the identity of phraseology or from other evidentiary facts. Ball, Law of Copyright and Literary Property, 601, Section 263; *Wilkie v. Santly Bros.*, 2d Cir., 91 F.2d 978, 979; *Dam v. Kirk LaShelle Co.*, 2d Cir., 175 F. 902, 907, 41 L.R.A.N.S. 1002, 20 Ann. Cas. 1173; *Christie v. Harris,* D.C.N.Y., 47 F.Supp. 39, 40; *Simonton v. Gordon,* D.C.N.Y. 12 F.2d 116, 123.

In *Wilkie v. Santly Bros., supra* 2d Cir., 91 F.2d 978, although there was no direct evidence of access, it was held that access could be inferred, the court saying 91 F.2d at page 979: 'Where similarities or identities are relied upon they must do more than engender a suspicion of piracy; they must establish piracy with reasonable certainty. There was some evidence here of the possibility of physical access by the appellants; the court below did not so find. But the charge of infringement does not fail merely because the infringer is not caught in the act, for access may be inferred or found circumstantially from the plan, the arrangement, and the combination of materials contained in the composition. *Edwards & Deutsch Lithographing Co. v. Boorman* (7th Cir.) 15 F.2d 35, certiorari denied 273 U.S. 738, 47 S.Ct. 247, 71 L.Ed. 867 * * *. Internal proof of access may rest in an identity of words or in the parallel character of incidents or in a striking similarity which passes the bounds of mere accident. *General Drafting Co. v. Andrews* (2d Cir.) 37 F.2d 54; *W. H. Anderson Co. v. Baldwin Law Publishing Co.* (6 Cir.) 27 F.2d 82; *Simonton v. Gordon,* D.C.S.D. N.Y., 12 F.2d 116."

Also see *Arnstein v. Porter,* 154 F.2d 464.

Such similarity exists in this case.

Defendants' defense of independent development is, at most, an issue of fact to be determined upon a proper trial of this cause. Considering the striking similarities between plaintiff's admittedly original scripts and defendants' scripts, at this point the defense would appear doubtful at best. But this dissent could not make this factual determination at this stage. However, to the contrary, the motion judge below and the majority here give complete credence to the defense of independent development. Independent development is a proper defense only where there is little or no similarity in the contested literary product. (*Weitzenkorn v. Lesser* (Supreme Ct. Calif. 1953), 256 P.2d 947; *Kovacs v. Mutual Broadcasting System,* 221 P.2d 108; *Jacobs v. Hill* (1962), 26 Cal. Rept. 591.) The majority here says the plaintiff's evidence of similarity was insufficient. However, in a motion for summary judgment we are not to

test the sufficiency of the evidence. *Ruby v. Wayman* (1968), 99 Ill.App. 2d 146; *Lumbermans Mutual Casualty Co. v. Poths* (1968), 104 Ill.App. 2d 80.

Defendants take the position that their admittedly self-serving affidavits denying knowledge of the plaintiff's scripts prove beyond all doubt that Miss Dahl's scripts were the product of independent development. This argument overlooks the admitted knowledge of the defendant Morris and his close relationship with other defendants. It overlooks the obvious fact that most of defendants' affidavits were made by persons who had not taken part in the actual writing of the defendants' scripts and therefore they would not necessarily know from whence came the material for the Dahl scripts.

Granting Miss Dahl has been active in the beauty consulting field for the past fifteen years and that she has become known as a beauty and fashion expert, and that since 1954 she has written syndicated feature articles dealing with beauty tips for women, Miss Dahl has admitted that the television scripts in question were written in collaboration with other writers. It is entirely possible that Miss Dahl knew nothing of the Roberts' scripts; nevertheless, the Roberts' scripts might still have been used in the creation of the Dahl scripts.

In the case of *Weitzenkorn v. Lesser*, 256 P.2d 947, upon which both plaintiff and defendants rely, the court stated:

"Having both productions before it * * * the court may determine whether there is substantial similarity between them. If, as a matter of law, there is no such similarity, no question of fact is in issue and the demurrers to each count of the complaint were properly sustained. But if, from a comparison of the two productions, such similarity reasonably might be found, that issue, and also the question as to copying, should have been submitted to the jury for determination." 256 P.2d at 957.

The motion judge wrote a lengthy opinion in which he weighed the "evidence" as if there had been a trial. For example, he writes: "Plaintiff has developed no evidence to the contrary," and also says: "Furthermore, plaintiff has not established that Victor Morris disclosed her idea or her scripts for a television show on beauty to anyone," thus applying the *Pedrick* standards for a directed verdict. He was not sitting as a trial judge who heard the case and could look at the "evidence," but only as a motion judge to consider whether there were facts alleged and denied to join the issue for a jury to decide. He further wrote in his opinion: "Thus the fact that Victor Morris had access to plaintiff's scripts and worked for the public relations firm of Ruder and Finn, who had a

client named Clairol, is not determinative of the access question." This is an issue to be decided by a jury. The defendants admit in their brief that Morris had access to plaintiff's scripts.

In the majority opinion is cited the case of *Lapsley v. American Institute of Certified Public Accountants* (1965), 246 F.Supp. 389, where the judge granted a motion for directed verdict on the ground that no evidence of access had been presented. A directed verdict is not in point in the instant case; however, that is what the motion judge did.

In the instant case, substantial similarity exists. Under the facts present here (notwithstanding defendants' denial) a jury should determine whether or not the plaintiff's scripts were copied. The trial judge erroneously weighed the evidence in rendering his opinion.

I would reverse the summary judgment entered by the trial court and remand the cause for trial.