FENTON McHUGH PRODUCTIONS, INC., Plaintiff-Appellant, *v.* WGN CONTINENTAL PRODUCTIONS CO., Defendant-Appellee.

First District (2nd Division)    No. 81-392

Opinion filed April 6, 1982.

Charles A. Boyle and J. Timothy Loats, both of Scheele, Serkland & Boyle, of Chicago (William J. Harte, of counsel), for appellant.

Reuben & Proctor, of Chicago (Don H. Reuben, Shane H. Anderson, James A. Klenk, and Steven A. Weiss, of counsel), for appellee.

JUSTICE DOWNING delivered the opinion of the court:

Plaintiff Fenton McHugh Productions, Inc. (McHugh), filed a two-count amended complaint against defendant WGN Continental Produc-

tions Co. (WGN) based upon the theories of tortious interference with a literary property right (count I) and upon breach of fiduciary duties (count II). The trial court ordered count II stricken prior to trial. At the close of McHugh's case, the trial court granted WGN's motion for a directed verdict on count I.

In appealing these results, McHugh argues the trial court erred (1) in directing a verdict for WGN on count I; (2) in striking count II; and (3) in limiting the scope of evidence as to McHugh's possible damages.

McHugh is essentially a one-man company, named after its operator, Fenton McHugh (also referred to hereafter as McHugh). McHugh engages in the production of television and audiovisual programs. Since 1954, he has produced, among other things, television shows for CBS and NBC; documentary programs for Storer Broadcasting, RKO Television, and Time-Life Broadcasting; and industrial films for corporations such as Eastern Airlines. WGN is a wholly owned subsidiary of WGN Continental Broadcasting Co., which telecasts programs over station WGN in Chicago.

In January 1975, WGN, in conjunction with McHugh, undertook production and distribution of a national farm news show entitled "National Farm Digest." The program left the air in early April 1975, after an initial 13-week run. In July 1975, WGN began presentation of a new, nearly identical national farm news show called "U.S. Farm Report."

McHugh filed suit against WGN on May 12, 1976, for breach of contract. This complaint was followed by four amended complaints, the last being filed on the first day of trial, October 21, 1980. This fourth amended complaint pleaded the causes of action noted. The trial court struck count II upon WGN's objection to its filing.

At trial, McHugh testified on his own behalf. In the spring of 1974, he had seen the opportunity and market for production of a national farm news show. McHugh perceived that while there were numerous local farm news shows being broadcast in various locales throughout the country, no national show existed. McHugh believed this was due to the prohibitive distribution costs for a national broadcast.

McHugh was aware, however, that a new technique for duplicating a videotaped show, called high-speed dubbing, could dramatically reduce distribution costs and make a national farm show "economically feasible." In pursuit of this idea, he initially "informally" approached Storer Broadcasting Co. for its opinion as to the viability of the program. McHugh also inquired whether several businesses, including Ralston-Purina and International Harvester, might be interested in sponsoring the program.

In May or June 1974, McHugh talked with Bradley Eidmann, general manager of WGN, about the possibility of cooperative production of the show. Their meetings eventually resulted in an oral agreement to that

effect. The duties were divided between the parties, with McHugh responsible for writing scripts, WGN for controlling technical production aspects of the show, and both (although mainly McHugh) for securing sponsorship.[1]

A demonstration film was created to show potential sponsors. In August 1974, Massey-Ferguson Co. agreed to buy one minute of national advertising time per week for the show's first 13-week run. Later, two other sponsors were secured for the remaining two national advertising minutes. Both of these latter advertisers indicated they would not be renewing after the first 13-week run due to the seasonal nature of their products.

The show went on the air in January 1975. Although the parties had discussed the matter, no written agreement had been entered into at that point. Consequently, McHugh submitted a proposed contract. WGN countered with its own proposed agreement.

By mid-March 1975, no written agreement had been reached, a situation not unusual in the television industry. In the meantime, Massey-Ferguson had decided not to renew its sponsorship for the program's second 13-week run. The other two sponsors, as noted, had previously indicated they would not advertise during that period. Therefore, as of mid-March 1975, the parties had no sponsors for the show's second run which was set to begin in early April.

McHugh continued his efforts to secure new sponsors, focusing on International Harvester. In the meantime, the parties entered into a written joint venture agreement on March 19, 1975. Under that agreement, McHugh was to receive 30% of the net proceeds of the show. He was solely responsible for securing sponsors for the program. A contractual provision allowed WGN to terminate the agreement prior to the commencement of any 13-week period if national advertisers had not yet agreed to buy at least three minutes per week of advertising time.

On March 30, McHugh told WGN that International Harvester was interested in sponsoring "National Farm Digest," but he was having trouble reaching final agreement with them on the matter. The program's host, Orion Samuelson of WGN, told McHugh he would contact a friend at International Harvester about the matter.

McHugh continued to seek sponsors for the program, and as part of that effort went to a broadcaster's convention in Las Vegas. While there,

---

[1] The show worked on a "barter system." The parties were responsible for securing national sponsors for three minutes of air time per show, the revenues to be kept by them. Each station to which the show was distributed was given three minutes of air time per show for which local advertising could be sold. Advertising contracts generally are sold in multiples of 13-week blocks, a period known as a broadcasting quarter.

on April 7, McHugh received a phone call from Eidmann of WGN. The latter told McHugh that WGN was terminating the agreement due to lack of sponsorship. "National Farm Digest" was thereupon pulled off the air.

After these events, McHugh hoped to continue production of the show on his own. However, on April 29, he learned WGN planned to proceed with its own show, "U.S. Farm Report." It was eventually sponsored by International Harvester, and debuted in July 1975.

On cross-examination, McHugh admitted there were no national sponsors for "National Farm Digest" after its initial 13-week run. He knew the contract with WGN allowed the latter to terminate the agreement in such circumstances. McHugh was familiar with television contracts from his prior experience in the industry. He received all money due him from WGN under the contract.

McHugh also related that none of the components of the show, that is, its format, national scope, or the low-cost production technique used, had originated with him. High-speed dubbing had been possible since 1973. McHugh had presented the idea to others in a limited manner prior to its presentation to WGN.

Orion Samuelson, host of "National Farm Digest" and a WGN employee, testified he suggested the idea of a national farm news show to his superiors at WGN prior to McHugh. Nothing had been done about the idea.

Samuelson denied he told McHugh he would contact his friend at International Harvester in an effort to secure their sponsorship of the program. He never took such action. He noted that company did eventually agree to buy three minutes of advertising on WGN's new farm show.

Bradley Eidmann testified he had had discussions on the idea of a national farm show before McHugh suggested it. He admitted that an International Harvester representative had contacted him about sponsoring the farm show just prior to WGN's decision to cancel it and to terminate the agreement with McHugh. Prior to that, McHugh had told Eidmann that International Harvester had agreed to buy one minute of advertising time on "National Farm Digest" for its second 13-week run. Eidmann learned no such agreement had in fact been reached. On May 27, 1975, International Harvester did agree to sponsor "U.S. Farm Report."

After McHugh presented the testimony of additional witnesses (which is not considered relevant to our disposition of this appeal)[2], WGN's motion for a directed verdict was granted.

---

[2] The other witnesses called by McHugh included two advertising executives at International Harvester's ad agency, an International Harvester marketing executive, a former associate of Orion Samuelson at WGN, a WGN production man, and an accountant.

# I

McHugh asserts the trial court erred in directing a verdict for WGN on count I.

■■ According to McHugh, count I states a cause of action for "interference with and appropriation of a property right," or, more precisely, for tortious infringement of an asserted common law copyright.[3] The elements of this tort action are (1) the existence of a property right of the plaintiff which is protected by the common law; (2) infringement of that property right by the defendant through copying or other similar forms of misappropriation; and (3) damages resulting therefrom to the plaintiff. (See *Golding v. RKO Pictures, Inc.* (1950), 35 Cal. 2d 690, 694, 221 P.2d 95, 97; *Glane v. General Mills, Inc.* (Cal. App. 1956), 298 P.2d 626, 628.) A property right in an idea, often referred to as literary property,[4] is protected by the common law when it is shown to be novel, it has been reduced to concrete (as opposed to abstract) form, and it has not been subject to "publication."[5] (*Szczesny v. W.G.N. Continental Broadcasting Corp.* (1974), 20 Ill. App. 3d 607, 315 N.E.2d 263.) Misappropriation of that right can be demonstrated by proof of copying by the defendant. Copying can be inferred from a showing of substantial similarity between plaintiff's property and that of defendant, and access of defendant to plaintiff's property. (*Roberts v. Dahl* (1972), 6 Ill. App. 3d 395, 401-02, 286 N.E.2d 51, *appeal denied* (1972), 52 Ill. 2d 599.) Obviously, the act of the defendant must also have been "wrongful" in a tortious sense.[6] In order for the trial court's ruling directing the verdict for WGN on this cause of action to have been proper, the requirements of the well-known *Pedrick* standard, which need no repetition here, must have been met. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

We believe the trial court's ruling was correct. The evidence pre-

---

[3] Since this controversy arose prior to January 1, 1978, there is no concern that the matter has been preempted by the Federal Copyright Act of 1976. See 17 U.S.C.A. §301(b)(2) (1977); *O'Bryan Construction Co. v. Boise Cascade Corp.* (1980), 139 Vt. 81, 424 A.2d 244.

[4] Literary property, although difficult to precisely define, is generally considered to arise from literary, artistic, aesthetic or other creative work or from the application of scientific, industrial, or technical research and development. See Kaul, *And Now, State Protection of Intellectual Property?* 60 A.B.A. J. 198 (1974).

[5] "Publication" is the act of the author dedicating his work to the public, which dissipates the protection afforded to a common law copyright. *Vic Alexander & Associates v. Cheyenne Neon Sign Co.* (Wyo. 1966), 417 P.2d 921, 923.

[6] In most cases involving violation of a common law copyright, the plaintiff has the option of proceeding in tort, as McHugh did, or on the theory of a contract implied in law, or quasi-contract. (*Szczesny v. W.G.N. Continental Broadcasting Corp.* (1974), 20 Ill. App. 3d 607, 612; see *Belt v. Hamilton National Bank* (D.D.C. 1952), 108 F. Supp. 689, 691, *aff'd* (D.C. Cir. 1953), 210 F.2d 706; see also Havighurst, *The Right to Compensation for an Idea*, 49 Nw. U.L.R. 295, 304 (1954); *Stanley v. Columbia Broadcasting System, Inc.* (1950), 35 Cal. 2d 653, 221 P.2d 73.) Here, however, the parties entered into an express contract. This precludes reliance upon quasi-contractual theory.

sented shows that the parties freely entered into a written "joint venture agreement" on March 24, 1975. In his complaint, McHugh alleged he was forced to sign this document due to "undue influence, duress and coercion"; however, the trial court granted "partial summary judgment" to WGN on this question. Although McHugh argued on oral argument that the contract was signed under duress, we do not find that contention properly raised or supported by the record. Consequently, the terms of that agreement are central to this case.

One provision of the agreement states:

> "WGN may terminate the joint venture effective upon the completion of any thirteen (13) week series of Programs * * * if there is not one (1) or more national advertiser sponsor * * * who has * * * agreed to pay for sponsorship of three (3) or more minutes of commercial time in each Program. * * * After termination of the joint venture, either party may create, produce, merchandise, sell and syndicate television programs similar or identical to the Program, provided however, that neither party shall use the title 'National Farm Digest' * * *."

The evidence shows that at the time WGN terminated the agreement, there were in fact no national advertisers contracted to sponsor the program's second 13-week run. Further, the contract obligated only McHugh to acquire such advertisers; thus, their absence could not be attributed to any wrongful failure of WGN to seek new advertising. The evidence shows that after termination of the agreement, WGN merely relied upon its contractual rights in producing "U.S. Farm Report," a program nearly identical to "National Farm Digest," but which as required did not use the latter's title.

Consequently, it is clear there is no proof whatsoever that WGN tortiously infringed upon, misappropriated, or otherwise wrongfully affected McHugh's alleged common law copyright in the idea of a national farm news show. In the absence of this element, McHugh could never succeed in procuring a verdict in his favor. Thus, the *Pedrick* standard was met. The trial court committed no error in directing a verdict for WGN on count I.

## II

McHugh claims the trial court erred in striking count II of the fourth amended complaint before trial.

Count II purportedly states a cause of action for breach of a fiduciary relationship existing between members of a joint venture. The record indicates the complaint containing count II was filed on the first day of trial, October 21, 1980, some 28 months after McHugh filed his third amended complaint and 53 months after the initial complaint was filed.

The record further shows that the first and second amended complaints, filed 40 months and 34 months, respectively, before the complaint at issue, each contained a count premised upon the same cause of action as count II.

■■ As noted by WGN, the ruling upon the motion for leave to amend a complaint rests within the sound discretion of the trial court. That decision will not be reversed absent a showing of clear abuse of discretion. (*Farnor v. Irmco Corp.* (1979), 73 Ill. App. 3d 851, 858, 392 N.E.2d 591, *appeal denied* (1979), 79 Ill. 2d 620.) Cases have held that no clear abuse of discretion exists where a trial court denied an amendment proffered on the eve of trial, which amendment sets out matters the plaintiff must have been aware of earlier (*Farnor; Ennis v. Illinois State Bank* (1969), 111 Ill. App. 2d 71, 78, 248 N.E.2d 534), or which would result in an unwarranted delay in trial (*Nurnberger v. Warren & Van Praag, Inc.* (1971), 133 Ill. App. 2d 843, 851, 272 N.E.2d 234).

■■ McHugh fails to explain why he found it necessary to add count II on the first day of trial when he had alleged and then withdrawn the same cause of action on two instances three years earlier. In such circumstances, there was no error committed in striking count II.

### III

McHugh contends the trial court erred in limiting the scope of damages evidence he might present under count I. Since the trial court properly directed a verdict for WGN on this claim, we need not address the issue.

For the foregoing reasons, we affirm the results achieved below.

Affirmed.

STAMOS, P. J., and HARTMAN, J., concur.