[Civ. No. 23513. Second Dist., Div. Two. May 29, 1959.]

JULES H. TEICH, Appellant, v. GENERAL MILLS, INC.
(a Corporation), Respondent.

Max E. Gilmore and Daniel A. Weber for Appellant.

Gibson, Dunn & Crutcher, Richard H. Wolford and John L. Endicott for Respondent.

ASHBURN, J.—This case falls within the ambit of *Desny* v. *Wilder*, 46 Cal.2d 715 [299 P.2d 257]. Plaintiff sued to recover upon a contract to pay the reasonable value of an idea submitted to defendant in concrete form, a gadget for use as a premium in one of its products, a "new children's do-it-yourself item in the photographic field." Plaintiff did not claim novelty and originality which would make his "premium item" protectible property within the common law of copyright and plagiarism. He relied upon contract.

A jury awarded plaintiff a recovery in the sum of $35,000. Motion for directed verdict had been made and denied; this was followed by a motion for judgment notwithstanding the verdict, which was granted. ■ Plaintiff has appealed from that order and from the judgment entered pursuant thereto. As the order is not appealable (*Schramko* v. *Saulter*, 146 Cal.App.2d 549, 553 [303 P.2d 1061]), the attempted appeal therefrom must be dismissed. The merits of the ruling are reviewable upon the appeal from the judgment.

■ The applicable rule of review is stated in *Estate of Arnold*, 16 Cal.2d 573, 581 [107 P.2d 25]: "The right of the trial court to render a judgment notwithstanding the verdict is the same as its right to grant a nonsuit. (*Card* v. *Boms*, 210 Cal. 200, 202 [291 P. 190].) It may neither grant this motion for a nonsuit nor may it render judgment notwithstanding the verdict if there is any substantial evidence before the court in the first instance in support of plaintiff's case, or in the second instance in support of the verdict rendered by the jury." (Accord: *Devens* v. *Goldberg*, 33

Cal.2d 173, 177 [199 P.2d 943] ; *Champion* v. *Bennetts,* **37** Cal.2d 815, 820 [236 P.2d 155].) We therefore accept for present purposes all evidence and inferences favorable to plaintiff-appellant.

Plaintiff's proffered premium was a kit for making sun pictures, a thing which he had done as a boy, as had many other boys. It consisted of a black opaque envelope in which were contained a collapsed cardboard holder, a negative consisting of a picture printed on cellophane and two pieces of sensitized paper. The idea was that a child could use this kit to create a picture through his own efforts. The process is simple; the sensitized paper is inserted in the holder and the cellophane printed negative superimposed over it. Upon exposure to the sun the picture of the negative is printed upon the sensitized paper.

Through expenditure of much effort and substantial monies plaintiff had brought this concrete expression of his idea to the point where he thought it marketable. So he called the Los Angeles office of defendant General Mills, Inc., and inquired whether anyone there could purchase premium items and was told to contact Mr. Otis Young of the San Francisco office, that he was the one who could purchase those items. Mr. Young was advertising and sales promotion manager of Sperry Operations, which was a geographical division of General Mills, Inc., and in no sense a separate entity although it was largely autonomous, distributing grocery products in the western portion of the United States. The headquarters of General Mills, Inc., was in Minneapolis. Mr. Young had sole responsibility of procuring premiums for Sperry products but he testified that none of them have appeal for children; that that division did not use ''kids' '' premiums. Mr. Young had no duty to report his premium activities to the head office, which was located in Minneapolis.

On July 6, 1955, plaintiff wrote Mr. Young advising that ''I have developed a new children do-it-yourself item in the photographic field. I feel it would make an excellent premium item for your company. . . . I have never offered this to anyone and I would like to make an appointment preferably on a Monday with you and discuss its possibilities.'' On the 8th he received from Mr. Young an answer, ''with regard to a premium item which you have developed for us in the children's field.'' He also suggested that plaintiff call on him on the 18th. Before that date arrived Young telephoned plaintiff

from San Francisco postponing the meeting to July 20th. In that conversation he said that if plaintiff's item was accepted some six to seventeen million of them could be bought. On July 20th plaintiff called at Young's San Francisco office. There was also present Mr. Lawrence D. Dunham who was vice president of an advertising firm which worked with the personnel of General Mills, being in constant touch with Sperry Operations and having nothing to do with General Mills national products. There were also present two other men of the defendant company, "observers or executives" whose names plaintiff could not remember at the trial. Plaintiff testified: "After the introductions I told Mr. Young that I would be willing to disclose this premium idea to him if he expressly understood that if he used my premium item I would be paid for it and he agreed. . . . Q. You say 'he agreed.' That is your conclusion. It may be stricken. What did he say? A. He said 'Yes, I would if I used it.' " Plaintiff thereupon disclosed his idea and the kit; demonstrated the making of a picture with it. Young "was quite surprised at what he saw and they all seemed to be elated with the results. They thought it would be quite a nice premium. They said it would be a nice premium for the youngsters, they would have something that they could make themselves and it would give them satisfaction that they were able to develop their own pictures." The question of permanency of the picture was raised and plaintiff said it would last possibly six hours to six months if not further exposed to light. He was asked "whether there was a probability of getting some permanency in the negative. I told them that could be obtained, that I would have to work on that when I arrived back at Los Angeles. They seemed satisfied with what they saw. I left some samples there, I was asked to, and said goodbye to the gentlemen and went on home." Young's testimony differed in some substantial respects, denying that Teich said that he wanted it understood before showing his premium item that if Young liked it he would be paid for it, or that he told plaintiff that if the item was something that he, Young, liked he would be happy to pay plaintiff for it. But he also testified: "Q. . . . Well, when he came to the office and displayed his item, did you look at it with the expectation that if you used it, you would pay him for it? A. Pay him for the premium? Q. Yes. A. Certainly." Again: "Q. And you knew at that time that he was disclosing it and demonstrating it to you with the expectation if you used it he would receive some compensation

for it; isn't that true? A. I always assume that.'' Unquestionably plaintiff established a contract on the part of defendant to pay for his idea if used by it. However, from that day Mr. Young ignored him.

On July 22d plaintiff wrote Young that he had achieved permanency of picture by using a different type of paper and a fixer or hypo. Receiving no response plaintiff waited about a week and then sent a night letter which was almost a duplicate of the communication of the 22d; it met with silence. Then plaintiff tried to get Young on the telephone but was told he was ''not available.''

In January, 1956, plaintiff saw for the first time a package of General Mills cereal known as Trix which showed on the outside that it contained a ''Magic Sun Picture.'' Buying and opening one he found a kit bearing marked similarity to his own. The basic principle was the same but there were differences in details. The negative and paper were smaller in size than plaintiff's; the negative was about one-third of the thickness of his own but it was cellophane, or acetate as respondent calls it. Defendant's negative was printed by rotogravure process, while plaintiff's was done with rubber dies or plates. There were no other substantial differences. Testing showed that the sun picture produced by a Trix kit had no more permanency than plaintiff's own. So marked was the similarity of the two kits that Mr. Young, when he first learned of the Trix premium through a ''planning letter'' from the Minneapolis office, was amazed. He testified: ''Well, I would like to give you my reaction when I got this planning letter. Q. Yes. I would appreciate it. A. I thought to myself, 'Holy smoke! Did I miss one out here?' Q. I see. Did you think that Mr. Teich had gone to Minneapolis and sold—— A. That's right, yes. Q. ——his idea to Minneapolis? A. That's right. And as I recall the premium itself, it was small and to me it appeared something like the one Mr. Teich had.'' Also: ''It was, I think, alike in the approximate size of the thing, and generally in the method of handling the thing it seemed to be basically the same procedure.'' Young also called Dunham and ''gave him the same reaction. I said, 'Do you suppose we missed one out here?' '' Dunham testified: ''I think I can remember his exact words. He said: 'I wonder if we passed something up here. ''Trix'' has a premium similar to the one we looked at last summer.' ''

█ A showing of access and similarity raises an inference of copying. (*Golding* v. *R.K.O. Pictures, Inc.*, 35 Cal.2d

690, 695 [221 P.2d 95]; *Kovacs* v. *Mutual Broadcasting System,* 99 Cal.App.2d 56, 65 [221 P.2d 108].) ■ The standard for determining similarity is "the common knowledge of the average reader, observer, spectator or listener." (*Stanley* v. *Columbia Broadcasting System,* 35 Cal.2d 653, 662 [221 P.2d 73, 23 A.L.R.2d 216].) ■ The last cited case also says, at page 660: "The problem of similarity between two compositions, whether literary, musical or dramatic, is a question of fact to be determined ultimately by a comparison of the two works upon the basis of the opinion of the average individual possessing a practical understanding of the subject. Although the majority of the decided cases involved a questioned infringement of a copyrighted work, it would seem that the test of whether or not an infringement existed would be the same as the question here involved—the determination of whether or not such similarity exists between plaintiff's and defendant's programs as to suggest to the average person the use by defendant of an idea originating with plaintiff upon proof of the other elements necessary to enable the plaintiff to recover." ■ *Kovacs* v. *Mutual Broadcasting System, supra,* 99 Cal.App.2d 56, 65: "The weight to be given the inference as against direct evidence of nonaccess and noncopying is a question for the trier of fact. There can be no copying in the absence of similarity. Whether there are substantial similarities to give rise to an inference of access and copying is one of fact to be determined by a comparison of the two programs upon the basis of the 'impression received by the average reasonable man.' [Citations.] The implied finding of the jury of similarity is binding upon a reviewing court if supported by substantial evidence. [Citation.]"

■ Mr. Young's reaction to the Trix kit is enough to show that a question of fact was presented at bar, necessitating an initial assumption by the trial judge and this court that there was copying and use by defendant of plaintiff's idea and its concrete expression contrary to the contract it had made with him. Although Mr. Young denied any communication with the Minneapolis office, or anyone other than Dunham, concerning plaintiff's disclosed idea, and also denied knowing what was occurring in Minneapolis or elsewhere with reference to a sun picture premium idea and kit, his testimony and that of Mr. Dunham was so squarely opposed to plaintiff's upon the principal issue of contract that the jury, disbelieving them in that respect, was entitled to reject the further assertion

that his idea was not passed on to the Minneapolis office. There were also other circumstances shown by the transcript which would warrant rejection of the testimony of both Young and Dunham. We must recognize therefore the existence of an inference of copying and use of plaintiff's idea.

Respondent counters this with the argument that that inference was dispelled by evidence which showed conclusively that there was no copying. ■ Reliance is placed upon decisions such as *Leonard* v. *Watsonville Community Hospital*, 47 Cal. 2d 509, 515 [305 P.2d 36], wherein it is said: "It is settled that where the evidence raises an inference that a fact exists, and either party produces evidence of the nonexistence of the fact that is clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved, the nonexistence of the fact is established as a matter of law. (See *Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868].) In these circumstances the inference is dispelled as a matter of law, and, if the fact inferred is necessary to establish an essential element of the plaintiff's case, a nonsuit or directed verdict is proper." ■ *Engstrom* v. *Auburn Auto. Sales Corp.*, 11 Cal.2d 64, 70 [77 P.2d 1059], also says that "an *inference* is dispelled as a matter of law when it is rebutted by clear, positive and uncontradicted evidence which is not open to doubt, even though such evidence is produced by the opposite side." A different rule applies to a presumption (see p. 517 of Leonard decision, *supra*), but we here deal with an inference. We have concluded that respondent's position in this regard is soundly taken.

Defendant's proof shows that the idea of sun pictures is an old one; that its adaptation to a premium for cereals and like products because of appeal to children was developed independently and without any knowledge of anything that plaintiff had done or of anything that had passed between plaintiff and Young; that the idea and the kit which were adopted for use in Trix packages were independently conceived and developed by Messrs. Herbert S. Valentine, Jr. and Earl K. Radford, Jr., who conducted an advertising agency in Kansas City under the name Valentine-Radford; neither of them had had any contacts with General Mills prior to writing to the Minneapolis office on May 27, 1955. ■ Defendant produced as witnesses at the trial the following persons who supported the defense thesis, were not contradicted, nor were they impeached by cross-examination or in any other manner, viz., Lowry H. Crites of Minneapolis, who was advertising

manager of General Mills for all nationally marketed cereals; James Street of St. Louis (by deposition), who was premium manager of General Mills in Minneapolis throughout 1955; Herbert S. Valentine, Jr. of Kansas City, partner in Valentine-Radford advertising agency, who developed and sold to General Mills the Trix premium. This uncontradicted evidence could not be rejected. ▮ *Estate of Kuttler,* 160 Cal.App. 2d 332, 337 [325 P.2d 624]: " 'While no universal and immutable formula can be prescribed for determining the weight to be accorded testimonial evidence, it has frequently been said that testimony which is not inherently improbable and is not impeached or contradicted by other evidence should be accepted as true by the trier of fact.' (*Gomez* v. *Cecena,* 15 Cal.2d 363, 366 [101 P.2d 477].) ▮ 'It is the general rule that "the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted as proof of the fact." (10 Cal.Jur. § 362, p. 1143; *Estate of Warner,* 167 Cal. 686, 690 [140 P. 583]; *Hynes* v. *White,* 47 Cal.App. 549, 552 [190 P. 836].)' (*Joseph* v. *Drew,* 36 Cal.2d 575, 579 [225 P.2d 504].)'' ▮ In *Hicks* v. *Reis,* 21 Cal.2d 654, 659 [134 P.2d 788], the court stated the general rule that: "Provided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted." ▮ But it was further said, at page 660: "To these well settled rules there is a common sense limited exception which is aimed at preventing the trier of the facts from running away with the case. This limited exception is that the trier of the facts may not indulge in the inference when that inference is rebutted by clear, positive and uncontradicted evidence of such a nature that it is not subject to doubt in the minds of reasonable men. The trier of the facts may not believe impossibilities. When the rebutting testimony is of such a nature that the minds of reasonable men cannot differ on the subject, then the trier of the facts cannot, and should not be permitted to, indulge in the inference."

The testimony of Messrs. Crites, Street and Valentine was buttressed by a line of correspondence which plaintiff's attorney stipulated to be genuine, the letters having been sent by the respective writers on or about the dates they bear and received in due course of mail by the respective addresses.

On May 27, 1955, Mr. Valentine wrote to "Premium Manager, Sales Division, General Mills, Inc." at Minneapolis, concerning the sun picture kit which he ultimately sold to that

company and which was used in Trix cereal. He said: "A client of ours is about to market a new idea for children that would appear to have real potential as a premium for a cereal manufacturer. I am not at liberty to send you a sample at this time, but would appreciate some general information for our guidance." (Incidentally, he was his own "client.") On June 17 Mr. Street replied, saying in part: "Perhaps the easiest way to tell whether your client's item is a satisfactory cereal premium, would be to brief me on a non-confidential basis with a few more details. . . . If you would be kind enough to let your hair down and tell me what I'm evaluating, I would be glad to do it. Hoping to hear from you again." On June 22d Valentine wrote Street for more information concerning General Mills' use of premiums. This information was sent him by Street on June 29th. A month later, on July 29th, Valentine sent to Street a brochure disclosing the details of his sun pictures, also a negative and some film. This was his first disclosure. This was followed by additional correspondence of August 11th and August 18th. Mr. Street evaluated Valentine's product, which was called "Sun Pix," and concluded that it was a good item, not new, but met all requirements, and that he would recommend it for use if the opportunity came along. Then there was an agreed "option," extending for a reasonable time, to enable General Mills to decide whether to buy; this by letter of August 19th. After more letters extending through the rest of the year, a sale was made by Valentine to General Mills and the first purchase order was received by him on January 16, 1956. It was an order for 6,250,000 "Sun Pix" premium packages. Sales of kits were then made to General Mills in an aggregate amount of $70,000 to $72,000.

Though the differences between plaintiff's kit and that found in Trix packages were insignificant, that portion of the stipulated correspondence which relates to minutiae of "Sun Pix" has a definite probative bearing upon the question of independent development by the firm of Valentine-Radford. Before plaintiff's disclosure to Young on July 20, 1955, the following letters passed between Valentine-Radford and third parties.

On June 1, 1955, Valentine-Radford wrote to Walt Disney Enterprises inquiring about the use of Disney characters and the Disney name on their package. In this letter it is stated: "I have worked out a novel kit for children that enables them

to reproduce photographs from film. The kit will probably contain five films and will retail for 50¢.'' [This ties in with their first letter to General Mills, dated May 27, 1955, in which they do not disclose what their suggested premium item is, other than that it is a new idea for children, approximately 2'' x 2'', which would retail for 50¢.]

On the same date, June 1st, they also wrote to Holiday Plastics, Inc. asking for prices on different quantities and weights of acetate. The letter indicates a prior meeting between these parties at which the ''project'' was discussed.

On June 9, 1955, Valentine received a letter from Eastman Kodak Company (a follow-up to its letter of June 1) advising that they had referred ''your problem of a suitable method for packaging 2'' x 2'' Kodak Studio Proof Paper along with a film negative to our Paper Division Laboratories for investigation,'' and requesting further information.

On June 13, 1955, Valentine-Radford was advised by letter that a search of the Patent Office records had been made with regard to the trade-mark ''Sun Pix'' and that same was open for use.

June 22, 1955, Valentine-Radford wrote to Highland Supply Company requesting prices for printing on acetate, stating ''I am interested in printing on acetate photos similar to the attached sample. These halftones would be printed in black ink at least 120 line screen and trimmed 2'' square. They would be printed on Dupont acetate film #200 in the rigid variety or equivalent in some other make. . . . This printing could be done either rotogravure or letterpress, depending upon the quality and your equipment. . . . I would also like to receive from you samples of the acetate on which you make your estimates.''

On July 7, 1955, Milprint, Inc., of Milwaukee, Wisconsin, a company engaged in packaging materials, lithography and printing, wrote to Valentine and Radford, per request, quoting prices on three different gauges of Acetate, to be ''printed 1 color 1 side . . . trim size 2 inches by 2 inches. . . . It is our understanding that a retouched photograph will be furnished to us. The plates would be charged extra at $85.''

We are satisfied that defendant proved conclusively the fact of independent development of ''Sun Pix'' by Valentine and his partner, and an independent sale of same to General Mills; that this business was conducted entirely through the Minneapolis office without knowledge of plaintiff's idea, kit or contract with Young of the Sperry division.

Our problem is thus narrowed to the question whether the defense of purchase from an independent developer of an item closely similar to plaintiff's is a good defense. In other words, does proof that there was no copying of plaintiff's product make a complete defense, although the thing actually used by defendant was closely similar to the one which plaintiff had presented to it? The authorities require an affirmative answer.

Respondent calls attention to this language of the Desny case, *supra*, 46 Cal.2d 715, 743: "Defendants had an unassailable right to have their own employes conduct the research into the Floyd Collins tragedy—an historical event in the public domain—and prepare a story based on those facts and to translate it into a script for the play." This was part of a general discussion of "The Law Pertaining to Literary Property" and seems to recognize the rule established by the authorities hereinafter cited. At page 749, it is also said: "For the purposes of appellate review of this summary judgment proceeding it is apparent from the comparisons above tabulated, and from the outlines which are set out in the margin, that a factual issue, rather than one of law, is presented as to whether defendants used plaintiff's synopsis or developed their production independently thereof."

*Golding* v. *R.K.O. Pictures, Inc., supra,* 35 Cal.2d 690, 696: "If it is established that the plaintiff has a protectible property in his literary work and there was copying, the elements of liability for infringement or piracy are established and all that remains is the determination of damages." Of course, plaintiff's contract supplied a substitute for the missing element of inherent protectibility which was under discussion in the Golding case.

The solution of the question of whether proof of absence of copying establishes a complete defense is governed by the same principle whether the action be one for infringement of a statutory copyright or a "common law" copyright. (See *Golding* v. *R.K.O. Pictures, Inc., supra,* 35 Cal.2d 690, 695; dissent of Mr. Justice Traynor in *Stanley* v. *Columbia Broadcasting System, supra,* 35 Cal.2d 653, 683.)

*Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal.App.2d 556, 561 [90 P.2d 371]: "If such similarities be shown as to justify an inference of copying of protectible material it is necessary to prove only that a substantial part of plaintiffs' manuscript was copied to sustain liability on the part of appellants." Concerning the instructions the court said, at page 565: "[I]n numer-

ous other instructions it was made clear to the jury that if appellants had independently conceived and prepared a composition which was not taken or copied from plaintiffs' work they would not be liable to plaintiffs for damages. . . . They would have been more than stupid if they believed that they could return a verdict for plaintiffs without a finding on their part that appellants had used plaintiffs' composition in the preparation of the photoplay.'' The judgment was affirmed.

 *Harold Lloyd Corporation* v. *Witwer* (9 C.C.A.), 65 F.2d 1, 4: ''That there are similarities between the play and the story is manifest and we proceed to consider the legal significance of such similarities. The primary question is whether these similarities resulted from copying the story; if not, the similarities are without legal significance. The secondary question is whether the similarities are themselves so marked as to prove by such circumstantial evidence the fact of copying, in the teeth of a denial thereof by those who produced the play.

'' 'There can be no infringement unless there has been a copying either in whole or in part of the copy-righted work. Some copying is necessary to constitute infringement.' 13 C.J. § 277, note 41, and cases.

'' 'Since there can be no infringement of copyright without some copying the mere fact of similarity or even identity between two works does not of itself make one an infringement of the other.' 13 C.J. § 278.

 ''The rule is well stated by Judge Learned Hand in the case of *Fisher, Inc.* v. *Dillingham* (D.C.) 298 F. 145, 147: 'To sustain it [an infringement suit], however, more must appear than the mere similarity or even identity, of the supposed infringement with the part in question. In this lies one distinction between a patent and a copyright. One may infringe a patent by the innocent reproduction of the machine patented, *but the law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted.' ''* (Emphasis added.)

 Volume 18, Corpus Juris Secundum, section 94b, page 216 : ''There can be no infringement unless there has been a copying, either in whole or in part, of the copyrighted work, and hence the mere fact of similarity, or even identity, between two works does not of itself make one an infringement of the other. . . . As stated *supra* § 25, both works may be entitled to copyright, although identical, if each is an original and inde-

pendent production, and similarity or identity is merely evidence of copying—more or less strong according to circumstances and the explanations which may be made of it, as shown *infra* § 156. It is only where the similarity or identity is due to copying from the copyrighted work that the later work may be deemed an infringement." *Id.* section 111, page 227 : "*Test of piracy.* It has been laid down as the clear result of the authorities in cases of this nature that the true test of piracy is to ascertain whether the author of the alleged piratical work has in fact used the plan, arrangement, and illustrations of the copyrighted work as the model of his own work, with colorable alterations and variations only, to disguise the use thereof, or whether the work is the result of his own labor, skill, and use of common materials and common sources of knowledge open to all men, and whether the resemblances are either accidental or arising from the nature of the subject. The question is always simply one of fact, whether defendant copied the matter from complainant's book or obtained it by his own skill and labor from the common source."

Volume 23, American Law Reports 2d 244, 369, paragraph 42 : "Anno : Literary or Artistic Property Rights" : "If defendant created his work by independent effort or bought a work created independently of any other work, the fact that the work strongly resembles plaintiff's work does not amount to an infringement, for there is no copying. See section 28, *supra.*" (See also § 29, at p. 340.)

To the same effect are : *Moore* v. *Ford Motor Co.* (2 C.C.A.), 43 F.2d 685, 687-688; *O'Rourke* v. *R.K.O. Radio Pictures* (D.C. Mass), 44 F.Supp. 480, 482-483; *Chautauqua School of Nursing* v. *National School of Nursing* (2 C.C.A.), 238 F. 151, 153 [151 C.C.A. 227] ; *Christie* v. *Harris* (2 C.C.A.), 47 F. Supp. 39, affirmed *Christie* v. *Cohan* (2 C.C.A.), 154 F.2d 827; 329 U.S. 734 [67 S.Ct. 97, 91 L.Ed. 634] ; *Greenbie* v. *Noble* (S.D.N.Y.), 151 F.Supp. 45, 68; *Fred Fisher, Inc.* v. *Dillingham* (So.D.N.Y), 298 F 145, 151-152; *Wilkie* v. *Santly Bros.* (2 C.C.A.), 91 F.2d 978, 979; *Smith* v. *Berlin,* 141 N.Y.S.2d 110, 114-115; *Vernon* v. *Sam S. & Lee Shubert* (DC.N.Y.), 220 F. 694, 695-696; *Bachman* v. *Belasco* (2 C.C.A.), 224 F. 817, 818 [140 C.C.A. 263] ; *Sarkadi* v. *Wiman* (2 C.C.A), 135 F2d 1002, 1003.

In the instant case it follows from the absence of copying that plaintiff has no cause of action. As the Supreme Court said in *Dun* v. *Lumbermen's Credit Assn.,* 209 U.S. 20, 22 [28 S.Ct. 335, 52 L.Ed. 663] : "Here seems to be no attempt

to coin money out of another's labor." The granting of the motion for judgment non obstante was not erroneous.

Appeal from order dismissed. Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 22, 1959.