[No. B187256. Second Dist., Div. Two. May 4, 2007.]

HOLLYWOOD SCREENTEST OF AMERICA, INC., et al., Plaintiffs and Appellants, v.
NBC UNIVERSAL, INC., et al., Defendants and Respondents.

632

COUNSEL

Schimmel & Parks, Michael W. Parks; Law Office of Bruce Adelstein, Bruce Adelstein; and Edward J. Horowitz for Plaintiffs and Appellants.

Irell & Manella, Henry Shields, Jr., Bruce A. Wessel and David A. Ryan for Defendants and Respondents.

OPINION

**CHAVEZ, J.**—Appellants Hollywood Screentest of America, Inc. (HST), and James Pascucci (Pascucci) (collectively appellants) appeal an order granting summary judgment against them and in favor of respondents NBC Universal, Inc., and NBC Studios, Inc. (collectively NBC). Appellants also appeal an order sustaining respondent Jeffrey Zucker's (Zucker) demurrer without leave to amend and a judgment of dismissal in favor of Zucker.[1] We affirm the order granting summary judgment as to all causes of action, and therefore find it unnecessary to address the demurrer.

## CONTENTIONS

Appellants contend that NBC's motion for summary judgment was improperly granted because (1) the trial court failed to adhere to the directions of a writ of mandate issued by this court; and (2) issues of material fact existed which should have been submitted to a trier of fact. Appellants further contend that Zucker's demurrer was improperly granted because Zucker, who was a top executive at NBC, may be held personally liable for appellants' cause of action for "breach of confidence."

## FACTUAL BACKGROUND

1. *The parties' initial communications regarding* Hollywood Screentest

Pascucci is the president of HST. HST is a corporate entity formed by Pascucci to develop and promote a television show also known as *Hollywood Screentest*, a reality show which would give ordinary people from all walks of life the chance to break into the close-knit Hollywood entertainment community. Respondents point out that the *Hollywood Screentest* idea is similar to a television show of the same name that aired for many years in the 1940's and 1950's. It was also similar to another show entitled *Don Adams' Screen Test*, which aired in the 1970's. Respondents also point out that in this

---

[1] NBC and Zucker will be collectively referred to as respondents.

decade, there have been many reality shows of the same genre, in which average people compete for the opportunity to become the next great pop star (*American Idol*, *Making the Band*, and *Popstars: USA*), the next great wrestler (*Tough Enough*), the next great model (*America's Next Top Model*), the next great comedian (*Last Comic Standing*), and the next great sports announcer (*Dream Job*).

Pascucci contacted Zucker about *Hollywood Screentest* in January 2001 by sending an e-mail to Zucker, who had just been named president of NBC Entertainment.[2] On January 14, 2001, Zucker wrote back, indicating that he would like to see the PowerPoint presentation which Pascucci had offered to e-mail to him. Two days later, Pascucci faxed a letter to Zucker, along with a confidentiality agreement, indicating that he would send the PowerPoint presentation if Zucker signed the confidentiality agreement. The confidentiality agreement provides, in part: "as an express condition to the Hollywood Screen Test's permitting [NBC] access to . . . information . . . [NBC] hereby agree[s] . . . that all such information be deemed confidential and exclusively proprietary to the Hollywood Screen Test . . . ." The agreement excludes any information that "is or becomes generally available to the public." Pascucci sent the PowerPoint presentation, which promised a "network of Micro Studios (kiosks) soon to be located in various McDonald's restaurants . . . ." Also, the presentation directed NBC to the *Hollywood Screentest* public Web site for "Visual samples for the concept behind the television series."

The parties communicated further over the next several months. Zucker asked Pascucci to contact John Miller, who dealt with advertising and promotion for NBC, so that Miller could evaluate the advertising opportunity provided by the kiosks Pascucci had described. Pascucci's communications with Miller began on February 8, 2001, when Pascucci asked Miller for a letter of "intent." Miller provided a letter expressing NBC's "interest" in the kiosks to "expose our programming to the people who would experience the Hollywood Screen Test kiosks." In April 2001, Pascucci informed NBC that the kiosks would no longer be at McDonald's but at Burger King. After an additional request that NBC agree to sell advertising on the kiosks, Miller wrote Pascucci indicating that it was "not in the cards." Pascucci contends that during this timeframe, he provided NBC with several written treatments and described subsequent changes and developments in the concept. He also copyrighted those materials and registered them with the Writers Guild of America.

---

[2] Pascucci first contacted NBC about *Hollywood Screentest* in 1995. An NBC executive informed Pascucci that she was not interested. NBC concluded at the time that *Hollywood Screentest* was not an original concept. Pascucci did not ask NBC to sign a confidentiality agreement in 1995.

## 2. *The revised concepts for* Hollywood Screentest

During the summer of 2001, Pascucci stopped e-mailing NBC. However, the e-mails resumed in September of 2001 with a communication to Zucker regarding a "revised and improved" *Hollywood Screentest* marketing plan and new Internet game. Zucker again referred Pascucci to John Miller. Pascucci e-mailed Miller later that day with a revised concept involving partnerships with Clear Channel. Three weeks later, Pascucci e-mailed Miller with another revised concept involving an *America's Funniest Home Videos*-style show. Miller responded by directing Pascucci to Jeff Gaspin, head of reality television for NBC. On November 6, 2001, Gaspin rejected Pascucci's proposal, stating: "Unfortunately we are not looking for this type of program right now."

On December 19, 2001, Pascucci wrote Zucker and Miller about another change in format involving the inclusion of short clips from classic movies. He e-mailed two more times regarding this revised concept, and mentioned yet another possible partner, the AMC channel. Miller was uninterested, telling Pascucci that he did not see any "promotional advantage to NBC."

Between January 2002 and September 2002, Pascucci wrote Zucker again 19 times. In a letter dated August 28, 2002, Pascucci referred to himself as a "[p]ain in the ass." His communications to Zucker during this time included descriptions of revised versions of the show and queries as to how to get it on the air.

According to Pascucci's deposition testimony, Zucker telephoned him in June 2002 and provided some encouragement for Pascucci to continue his efforts. Specifically, Pascucci claimed, Zucker stated that he liked the idea for *Hollywood Screentest* and instructed Pascucci to secure financing for the movie component of the project and to contact him when that was accomplished.

Respondents present a different version of the communications during this time period. They state that between June 5, 2002, and September 6, 2002, Zucker responded to Pascucci's e-mail messages only twice. In an August 15, 2002 communication, Pascucci asked Zucker, "can [you] get me a 'Letter of Interest' on Hollywood Screen Test?" Zucker responded, indicating that he was "going to pass" and telling Pascucci to "move on." On September 8, 2002, in response to an e-mail from Pascucci stating, "I won't bug you anymore after your FINAL response," Zucker responded, "still going to pass [¶] thank you."

3. *Similarities between* Hollywood Screentest *and the NBC television show* Next Action Star

On September 5, 2002, NBC issued a press release, which announced that NBC and Silver Pictures would be teaming up to present a new competitive reality series in which the winners would star in a prime-time action movie.

According to Pascucci, after reading a September 12, 2002 article regarding the *Next Action Star* project in Variety, he noted numerous elements that he thought were derived from *Hollywood Screentest*. Specifically, Pascucci pointed out: "The whole multimedia aspect of Hollywood Screen Test utilizing the Internet, utilizing movie screens, utilizing the TV show to promote the film component of the show in order to garner greater ratings not only for this particular TV show 'The Next Action Star' but also other NBC shows."

Pascucci also noted: "One of the elements that I gave Mr. Zucker was having an acting coach on the set interacting with the contestants to assist them in their various challenges"; and "[u]sing celebrities to act within a particular scene during various challenges." Pascucci summed up his complaints as follows: "The acting coach. The different challenges. The different categories. The grand prize. The multimedia aspects. Utilizing the movie as not only the grand prize but also utilizing it as part of the television show. Going behind the scenes, what's going on behind the scenes in these actors' minds before and after the challenge. The process of elimination during the challenges to where you end up with one male and one female winner." Pascucci stated that he did not believe that NBC had any of those ideas before he gave them to NBC.

4. *The creation of* Next Action Star

NBC's position is that it did not use any of Pascucci's ideas for *Hollywood Screentest*. In support of this position, NBC presented evidence that *Next Action Star* was independently created by individuals and entities completely unrelated to NBC. That evidence, set forth below, documents the process by which *Next Action Star* was created and developed by individuals at three different companies: Brass Ring Productions, GRB Entertainment, and Silver Pictures. The evidence shows that the development of *Next Action Star* by these three companies occurred over the course of a year before the show's creators presented it to NBC.

Rick Telles of Brass Ring Productions provided a declaration in support of NBC's summary judgment motion which explained that, during the summer of 2001, he collaborated with his colleague Cris Abrego and two producers from GRB Entertainment to develop a program for USA Network called *Hollywood Stunt School*. The show was also known as *USA's Next Action Hero*. Contestants would be eliminated each week with the winner appearing as a stunt person in a movie. USA Networks ultimately decided not to move forward with the project.

According to Telles's declaration, Sara Chazen of United Talent Agency suggested that he meet with the production company Silver Pictures. At the meeting, the group discussed a reality show involving stunts, and Greg Noveck of Silver Pictures suggested that the show be "attached" to a movie and that the winners of the competition star in the movie, rather than merely appear in stunts. Around this time Telles and his colleagues began to refer to the show as *Next Action Star*.

Michael Branton of GRB Entertainment was also a producer of *Next Action Star*. Branton's declaration authenticated seven documents, including the proposal written for USA Networks which was ultimately never developed, notes from meetings among the producers of the show, and various documents describing the state of the project at various times throughout 2002.

Gary Benz is the president and CEO of GRB Entertainment and was an executive producer of *Next Action Star*. Benz's declaration stated that *Next Action Star* was created by a team of independent producers including Benz and Michael Branton of GRB, Cris Abrego and Rick Telles of Brass Ring Productions, and Greg Noveck and Dana Shelbourne of Silver Pictures. Benz never spoke with anyone at NBC regarding *Next Action Star* until the show was pitched to NBC in August 2002.

Sara Chazen of United Talent Agency also provided testimony regarding the development of *Next Action Star*. She represented GRB and Brass Ring Productions in connection with the *Next Action Star* project. Chazen arranged a meeting in late 2001 at which GRB and Brass Ring pitched an idea to Silver Pictures for the parties jointly to produce a reality competition show where the winners would appear in a movie. Chazen's testimony confirmed that at that meeting, Greg Noveck suggested that the program be tied to a movie which would star the winners of the show. Chazen testified that she later arranged a pitch meeting at NBC where the independent producers presented *Next Action Star* as "a competition elimination show where men and women are going to get a chance to star in a . . . movie." She explained that *Next Action Star* would have one male and one female winner.

The declaration of NBC employee Michael Katz documents the scheduling and content of the meeting at which the *Next Action Star* producers pitched the program to NBC. The testimony of fellow NBC executive Jamila Hunter corroborated Katz's account. Jeffrey Gaspin also provided testimony as to NBC's interest in the project, and confirmed that NBC had no involvement with *Next Action Star* prior to the initial meeting in August 2002.

Appellants have provided no evidence calling into question the statements provided by the witnesses from Brass Ring Productions, GRB Entertainment, United Talent Agency, or any of the individuals present at the initial *Next Action Star* pitch meeting.

## PROCEDURAL HISTORY

### 1. *The complaints and Zucker's demurrer*

Appellants' second amended complaint against respondents, the operative complaint against NBC, was filed on November 4, 2003. It included causes of action for breach of written contract, breach of implied-in-fact contract, breach of the covenant of good faith and fair dealing, "breach of confidence," unjust enrichment/quantum meruit, accounting, misappropriation of intangible property interests, and unfair competition.

Zucker was named as a defendant in the second amended complaint as to the "breach of confidence" cause of action only. Zucker filed a demurrer on December 10, 2003, which the trial court, the Honorable Alan G. Buckner presiding, sustained with leave to amend on February 19, 2004. The third amended complaint, which named Zucker in its fourth cause of action for fraud and in its fifth cause of action for breach of confidence, was filed on March 1, 2004. Zucker demurred again, and on April 27, 2004, Judge Buckner sustained Zucker's demurrer without leave to amend. A judgment of dismissal in favor of Zucker was entered on October 13, 2005.

### 2. *NBC's summary judgment motion and the first hearing*

On June 17, 2004, NBC filed a motion for summary judgment or, in the alternative, summary adjudication. NBC argued, inter alia, that all of appellants' claims were barred because there was no disputed issue of fact that *Next Action Star* was independently created and that NBC used nothing submitted by appellants. Under *Teich v. General Mills, Inc.* (1959) 170 Cal.App.2d 791 [339 P.2d 627], NBC argued that it was entitled to summary judgment.

Appellants opposed the motion. They argued that Zucker had signed a confidentiality agreement and encouraged appellants with favorable remarks about *Hollywood Screentest.* Both parties filed objections to the evidence submitted by the opposing party, including objections to declarations.

Judge Buckner held a hearing on NBC's summary judgment motion on August 31, 2004. Upon considering the parties' objections to evidence, he ruled that several of the opinions stated in the declarations of appellants' expert witnesses Harris Tulchin and Greg Victoroff be stricken. After the hearing, he indicated that he would grant NBC's motion for summary adjudication as to the fifth cause of action for "unjust enrichment/quantum meruit" but deny NBC's motion in all other respects.

Judge Buckner asked appellants to provide a proposed order. The first two orders that appellants provided were rejected by Judge Buckner. The third proposed order, and NBC's objections thereto, had not been acted upon when Judge Buckner died in mid-December 2004.

On Friday, January 7, 2005, Judge Ricardo A. Torres, who was appointed to replace Judge Buckner, signed and filed appellants' third proposed order without notice and without conducting a hearing.

### 3. *The writ petition and alternative writ*

NBC filed a petition for writ of mandate with this court on January 26, 2005, requesting that Judge Torres's order be vacated and summary judgment be granted in NBC's favor.[3] On March 1, 2005, this court issued an alternative writ of mandate which gave the superior court two options:

"(a) (1) vacate your order of January 7, 2005, denying petitioners['] summary judgment and granting them summary adjudication of petitioners' fifth cause of action, and (2) assign a new judge who will hold a hearing, decide the case on the record of the motion for summary judgment that has been previously submitted and on argument at that hearing, and issue an order that comports with Code of Civil Procedure section 437c, subdivision (g); [or]

"(b) in the alternative, SHOW CAUSE . . . why a peremptory writ of mandate ordering you to do so should not issue."

---

[3] Appellants requested that we take judicial notice of the files and records of the writ proceeding. We granted that request on August 18, 2006.

On March 4, 2005, the superior court assigned the matter to the Honorable Rolf M. Treu. By minute order dated March 14, 2005, Judge Treu accepted option (a) of the alternative writ and scheduled a new summary judgment hearing. In keeping with the instructions set forth in the writ, Judge Treu ordered that "No further filings on this motion will be considered without permission having been previously granted by the Court."

### 4. *Judge Treu's rulings*

Prior to holding a new summary judgment hearing, Judge Treu issued tentative rulings on the parties' evidentiary objections and invited additional briefing on those issues. NBC submitted a brief arguing in support of the admissibility of two of its declarations. Appellants also submitted a brief which, according to Judge Treu's minute order, mainly "summarized rulings and argument before the late Judge Buckner" and went "well beyond the evidentiary issues at hand." Appellants also submitted a "wholly unsolicited declaration [of counsel] presumably to correct the objections made."

In a minute order dated July 19, 2005, Judge Treu ruled:

"In view of the mandate by the Court of Appeal that the Superior Court was to analyze the motion de novo, the Court is not going to consider Plaintiff's Supplemental Brief other than [those portions dealing with the evidentiary issues] . . . .

"The Court will not consider the Supplemental Declaration of [appellants' attorney] since that filing violates not only the order of this Court but also the briefing sequence of Code of Civil Procedure 437c.

"Counsel are admonished at the hearing on this motion, that there is to be no reference made to any prior rulings by any other Judicial Officer. The motion is being analyzed by the Court, . . . and will be argued by counsel, de novo."

The summary judgment hearing by Judge Treu was held on August 9, 2005. Before the hearing, Judge Treu gave three questions to the parties:

"[1.] What admissible evidence is there before the Court that the contents of the pitch of Next Action Sta[r] to NBC in 8-02 were not an independent creation?"

"[2.] What admissible evidence is there before the Court that Mr. Gaspin revealed, contributed or otherwise disclosed any content of the Hollywood Screentest pitch that was later used by NBC for Next Action Star?"

"[3.] If the Court finds for moving party on the issue of independent creation, what causes of action, if any, remain viable?"

At the hearing, Judge Treu informed the parties of several evidentiary rulings. He sustained NBC's objections to documentary evidence attached to a declaration of appellants' counsel on the grounds of lack of authentication. In addition, he sustained NBC's objections to the declarations of appellants' experts Harris Tulchin and Greg Victoroff, striking the two declarations in their entirety. He also informed the parties that he did not read over 1,500 pages of unmarked deposition pages attached to a second declaration of counsel filed with appellants' opposition brief on the grounds that it was not in compliance with former rule 316 of the California Rules of Court,[4] which requires that a party mark its deposition pages to indicate what testimony is pertinent.

After giving the parties the opportunity to respond to the questions that he had presented to them, Judge Treu granted NBC's summary judgment motion and ordered NBC to prepare the order and judgment. The order was filed on September 2, 2005. Judgment in favor of NBC was entered on September 19, 2005.

On November 1, 2005, appellants filed a notice of appeal from the September 19, 2005 judgment in favor of the NBC entities and from the October 13, 2005 judgment in favor of Zucker.

## DISCUSSION

### I. *Compliance with this court's writ of mandate*

Appellants' first argument is that the trial court failed to comply with the alternative writ of mandate issued by this court on March 1, 2005. The writ specified that the superior court should "decide the case on the record of the motion for summary judgment that has been previously submitted." Appellants argue that this directive was violated by Judge Treu when he made evidentiary rulings sustaining NBC's objections to the documentary evidence attached to appellants' counsel's declaration and striking the declarations of appellants' experts, Harris Tulchin and Greg Victoroff. Appellants further

---

[4] This rule was renumbered effective January 1, 2007, and is now rule 3.1116 of the California Rules of Court.

contend that this directive was violated by Judge Treu's failure to read the deposition excerpts which were filed in violation of former rule 316 of the California Rules of Court.

### A. The trial court properly considered and ruled upon the parties' evidentiary objections

Compliance with this court's alternative writ is reviewed de novo. (*Hampton v. Superior Court* (1952) 38 Cal.2d 652, 655 [242 P.2d 1].) The alternative writ issued by this court ordered the superior court to reconsider NBC's motion for summary judgment on the record previously submitted by the parties. That record included evidentiary objections filed by both parties. There is no language in the order forbidding the superior court from considering these evidentiary objections or in any way preventing the superior court from exercising its ordinary powers in connection with its analysis of the summary judgment record.

The parties' evidentiary objections were integral to the superior court's evaluation of the summary judgment motion. Under Code of Civil Procedure section 437c, the court is required to determine whether there are any triable issues of material fact. In order to make that determination, the court must necessarily first decide what admissible evidence it has before it: "Part of the judicial function in assessing the merits of a summary judgment or adjudication motion involves a determination as to what evidence is admissible and that which is not." (*City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 784 [97 Cal.Rptr.2d 140].)

Further, this court's alternative writ specifically ordered that the superior court vacate its order of January 7, 2005. The superior court complied. That order contained a ruling on the summary judgment motion itself as well as rulings on the parties' evidentiary objections. Because the Court of Appeal ordered that Judge Buckner's evidentiary rulings be vacated, a writ commanding the superior court to evaluate the record without reconsidering the evidentiary objections would essentially be an order overruling all such objections. That was not the intention of this court, as initial evidentiary rulings are within the domain of the trial court. (See *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 235 [114 Cal.Rptr.2d 151] [trial courts have a duty to rule on evidentiary objections, and it is not the function of an appellate court to make evidentiary rulings in the first instance].)

The alternative writ ordered the superior court to appoint a new judge to examine the entire summary judgment record de novo. We find that Judge Treu correctly interpreted the writ by understanding it to allow him to make evidentiary rulings within his sound discretion.

Appellants argue in the alternative that, if Judge Treu had the authority to make evidentiary rulings, he abused his discretion in refusing to consider a supplemental declaration filed by appellants' attorney.[5] The supplemental declaration, filed on June 27, 2005, provided "further authentication" of documents attached to the previously filed declaration and according to Judge Treu was filed "presumably to correct objections made." Judge Treu refused to consider the supplemental declaration for two reasons: it was filed in violation of the court's order specifying that no further filings would be considered without prior permission of the court; and it was filed in violation of the briefing sequence set forth in Code of Civil Procedure section 437c (section 437c).

Both of Judge Treu's reasons were sound. The alternative writ specifically directed the superior court to decide the case on the record that had previously been submitted. Thus, the trial court was to consider only those documents that were before Judge Buckner. While Judge Treu had invited further briefing on the parties' evidentiary objections, he had not given permission for a supplemental declaration to be filed. His refusal to accept such a filing was well within the court's discretion.

In addition, section 437c specifies the briefing sequence for a summary judgment motion. It provides for the submission of an opening brief with evidence, an opposition brief with evidence, and a reply brief. (§ 437c, subds. (a)–(b).) It does not allow for the submission of additional evidence by the opposing party after the moving party's reply. Judge Treu's refusal to accept the declaration on these grounds was also well within the discretion of the court.

B. *The trial court acted within its discretion in failing to read the deposition testimony filed in violation of the California Rules of Court*

Appellants claim that Judge Treu violated the writ's directive to "decide the case on the record of the motion for summary judgment that has been previously submitted" because he failed to read over 1,500 pages of deposition testimony attached to appellants' attorney's declaration that were filed in

---

[5] Appellants do not argue in their briefs that the trial court abused its discretion by sustaining NBC's objections to the declarations of Harris Tulchin and Greg Victoroff and striking those declarations in their entirety. Therefore we do not address this issue.

violation of rule 3.1116 of the California Rules of Court.[6] Appellants argue that we should review this issue de novo, as it involves a question of whether the trial court properly followed this court's writ of mandate. However, as we have discussed above, the writ did not divest the trial court of its inherent discretionary powers, which include making evidentiary determinations and taking appropriate action for noncompliance with organizational and formatting requirements. (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1208 [35 Cal.Rptr.3d 411] (*Parkview*); *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 72–74 [50 Cal.Rptr.3d 149].) We therefore review the court's decision not to read through much of the testimony attached to appellants' attorney's declaration for abuse of discretion.

Appellants rely on *Parkview* to support their position. In *Parkview*, the Court of Appeal, Second Appellate District, Division 7, reversed a grant of summary judgment which was based on a " 'lack of admissible evidence in opposition to the motion' " stemming from the plaintiff's " 'inadequate statement of undisputed material facts.' " (*Parkview, supra*, 133 Cal.App.4th at pp. 1201–1202.) The plaintiff's separate statement required the court " 'to comb the 37 pages of declarations and hundreds of pages of attached documents to unearth evidence supporting plaintiff's position.' " (*Id.* at p. 1208.) The trial court indicated that if it was not set forth in the separate statement, it did not exist because if it is not set forth in the separate statement no triable issue of material fact exists. (*Ibid.*)

The Court of Appeal determined that the trial court abused its discretion in granting the defendant's motion for summary judgment without providing the plaintiff an opportunity to correct the deficiencies in its separate statement. (*Parkview, supra*, 133 Cal.App.4th at p. 1210.) In reversing the trial court's judgment, the Court of Appeal stated: "The trial court's dissatisfaction with Parkview Villas's failure to file a proper separate statement is understandable . . . . Appropriate, limited sanctions for that procedural error are proper; 'terminating sanctions' are not. . . . '[T]he respondent [should be] afforded a reasonable opportunity to file [a proper statement].' " (*Id.* at p. 1216.)

The present case is distinguishable. First, Judge Treu did not disregard appellants' entire separate statement. He did not exclude the deposition testimony or prevent appellants from relying on it in support of their opposition to NBC's summary judgment motion. He simply admitted that he had not "read through the scores of pages" given the voluminous and

---

[6] The rule provides, in pertinent part, that "Other than the title page, the exhibit must contain only the relevant pages of the transcript" (Cal. Rules of Court, rule 3.1116, subd. (b)) and "The relevant portion of any testimony in the deposition must be marked in a manner that calls attention to the testimony" (*id.*, rule 3.1116, subd. (c)).

unorganized form in which it was submitted to him. Thus, appellants' comparison of Judge Treu's action as tantamount to terminating sanctions is not well taken.

Appellants further argue that, under *Parkview*, Judge Treu should have accepted appellants' counsel's offer to "correct any of those errors." However, as noted above, Judge Treu's action in failing to read what NBC's counsel described as "context" provided "in case someone wanted to look at what was between the pages" was of far lesser consequence than the sanctions imposed by the *Parkview* trial court.[7] In addition, Judge Treu was working under different procedural circumstances than those present in *Parkview*. He had been specifically ordered by this court to decide the motion on the record that was previously submitted to Judge Buckner. He therefore made an appropriate ruling enforcing a case-specific mandate from a higher court which prevented additional submissions without prior approval. As Judge Treu stated at the hearing in response to appellants' attorney's request that he accept a corrected declaration: "The mandate of the court was to review the documents, review the motion, decide the motion based on the filed papers . . . [T]hat's exactly what the court did and has done." Judge Treu's decision to disallow a corrected declaration, offered at the end of the hearing on the summary judgment motion, was not an abuse of discretion—especially given this court's mandate that he decide the case on the record before him.

## II. *The summary judgment ruling*

Appellants argue that the trial court's grant of summary judgment should be reversed. Because appellants believe that Judge Treu erroneously altered the record, appellants' arguments regarding reversal of the summary judgment motion as to each cause of action rely on "the record as it existed when NBC submitted its writ petition to this Court." We have determined above that Judge Treu's evidentiary rulings were in keeping with this court's writ of mandate and were not an abuse of the trial court's discretion. We therefore review the summary judgment on the record as it existed after Judge Treu's evidentiary rulings. (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014 [120 Cal.Rptr.2d 281] [appellate court must consider all of the evidence the parties offered in connection with the motion for summary judgment except that

---

[7] The court indicated that it had not read the deposition testimony attached to appellants' counsel's declaration or a supplemental declaration filed by NBC's counsel, both of which were not in compliance with the rule cited by the court. While NBC indicated that the additional pages were filed for context, appellants' counsel indicated that the reason their papers were so unorganized was that at the time their oppositions were due, they had been in the course of numerous depositions and had not had time to get all the paperwork organized.

which the trial court properly excluded].) Our review is de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

### A. *Independent creation*

The parties dispute heavily whether the legal doctrine of "independent creation" negates all of appellants' causes of action against NBC. We therefore preliminarily address this doctrine and the cases cited by the parties.

The independent creation doctrine is set forth in *Teich v. General Mills, Inc., supra*, 170 Cal.App.2d 791 (*Teich*). In *Teich*, the plaintiff had developed an idea for a children's item and submitted the idea to General Mills with the thought that it might be used as a cereal box prize. In the summer of 1955 he met with an advertising and sales promotion manager at a division of General Mills, who encouraged him to develop the idea. Teich's subsequent efforts to contact this manager were unsuccessful, but the following January he noticed a promotion for a similar item on a General Mills cereal box and, upon purchasing and opening the box, found inside the box an item markedly similar to the one he had presented to the company. (*Id.* at pp. 796–798.) He sued General Mills, claiming that the company had used his idea and that he was therefore entitled to compensation. He won before the jury but the trial court granted General Mills's motion for judgment notwithstanding the verdict. (*Id.* at pp. 803–806.)

The Court of Appeal affirmed the trial court's grant of judgment notwithstanding the verdict. The court explained that the defendant's receipt of the plaintiff's idea for the product, and the similarity between the plaintiff's idea and the defendant's product, created an "inference" that the defendant used the plaintiff's idea. (*Teich, supra*, 170 Cal.App.2d at p. 797.) However, the court found that this inference of use could be dispelled as a matter of law by direct evidence of independent creation. Such evidence existed in *Teich*. It consisted of the testimony of three witnesses and documentary evidence. (*Id.* at pp. 799–800.) The court held that this evidence dispelled the inference of use as a matter of law and explained "it follows from the absence of copying that plaintiff has no cause of action." (*Id.* at p. 805; see also *Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 650 [180 Cal.Rptr. 522] [evidence of the author's independent creation of the screenplay Shampoo rebutted plaintiff's inference of access to and use of her work].) NBC contends that the inference of use in this case is similarly

rebutted by uncontradicted evidence that GRB Entertainment, Brass Ring Productions, and Silver Pictures independently created the concept for *Next Action Star* without any input from NBC.

Appellants disagree, citing *Desny v. Wilder* (1956) 46 Cal.2d 715, 744 [299 P.2d 257] (*Desny*) for the proposition that "It is not essential to recovery that plaintiff's story or synopsis possess the elements of copyright protectibility if the fact of consensual contract be found. [Citation.]" In *Desny*, the plaintiff had submitted to a producer at Paramount Pictures Corporation a story idea based on a true story. The plaintiff conceded for the purposes of argument that the synopsis was not sufficiently unique or original to be the basis for recovery under the law of plagiarism or infringement. (*Id.* at p. 728.) Despite the plaintiff's use of a story that was in the public domain, the court concluded that "a factual issue, rather than one of law, [was] presented as to whether defendants used plaintiff's synopsis or developed their production independently thereof. [Citations.]" (*Id.* at p. 749.) Thus, summary judgment was reversed for a determination of whether the defendants appropriated the plaintiff's composition and used it or any part of it in the production of their photoplay without compensating the plaintiff for the value of his story. (*Id.* at p. 750.)

*Desny* is distinguishable. In *Desny,* the defendants had presented no evidence of independent creation, nor had they produced any evidence denying their use. (*Desny, supra,* 46 Cal.2d at p. 746.) Here, in contrast, defendants have produced extensive evidence documenting the development and creation of *Next Action Star* by entities entirely independent from NBC.[8]

Appellants' repeated protests that they need not show originality in order to receive protection are unavailing. In fact, the originality of appellants' ideas is irrelevant to the question of whether the independent creation of *Next Action Star* precludes appellants' causes of action. The key issue is not whether appellants' ideas were original, but whether respondents *used* appellants' ideas without properly compensating appellants for that use.

B. *Appellants have provided no evidence creating a disputed question of fact on the issue of use*

We have found that NBC has successfully shown undisputed evidence of independent creation by entities unrelated to NBC and unassisted by NBC.

---

[8] This evidence was included in the declaration of Rick Telles of Brass Ring Productions, the declaration of Michael Branton of GRB Entertainment and attachments thereto, the declaration of Gary Benz of GRB Entertainment, the testimony of Sara Chazen of United Talent Agency, the declaration of NBC employee Michael Katz, the testimony of NBC executive Jamila Hunter, and the testimony of NBC executive Jeffrey Gaspin. It is set forth in greater detail in part 4 of the Factual Background, *ante.*

We now look carefully at appellants' evidence to determine whether they have provided any evidence that calls into question the evidence supporting independent creation. We find that they have not.[9]

Appellants point to no evidence that NBC actually used their ideas. Instead, they ask that we draw inferences based on general similarities and timing. They argue that a fact question exists as to whether *Next Action Star* was independently created by virtue of (1) the numerous similarities between *Hollywood Screentest* and *Next Action Star*; (2) the modifications of *Next Action Star* from its original "stuntman" concept to the "actor" concept previously provided to NBC by Pascucci; and (3) NBC's simultaneous and suspicious acceptance of the modified *Next Action Star*'s concept and Zucker's final rejection of *Hollywood Screentest*.

■ Appellants' speculation as to NBC's use is insufficient to create a disputed issue of fact. An inference of use sufficient to challenge NBC's "clear, positive and uncontradicted evidence" of independent creation may not be drawn from " ' "suspicion alone, or . . . imagination, speculation, supposition, surmise, conjecture, or guesswork." [Citation.]' " (*Mann v. Columbia Pictures, Inc., supra,* 128 Cal.App.3d at pp. 648, 650–651.) Thus, the similarities and timing are insufficient to create a disputed issue of fact. In addition, the declaration of Rick Telles of Brass Ring Productions and the testimony of Sara Chazen of United Talent Agency—neither of which is contradicted by appellants—show that the concept of making the male and female winners "stars" of the movie, rather than just stuntmen, occurred as early as December 2001, at least six months before the creators of *Next Action Star* communicated with NBC regarding the show.

We conclude that the uncontradicted evidence presented by GRB Entertainment, Brass Ring Productions, and Silver Pictures that *Next Action Star* was independently created prior to any of these parties having any contact with NBC negates any inference that NBC used appellants' ideas. We address the consequences of this conclusion as to each of appellants' causes of action below.

---

[9] In so finding, we are aware that much of the evidence presented by appellants in support of their opposition was excluded by Judge Treu. However, we have read appellants' briefs and the supporting citations to the record comprehensively, despite the fact that appellants cite us to evidence found in submissions that were ultimately excluded by the court. We note that, even if this evidence had not been excluded by the trial court, appellants would still have failed to create a disputed question of fact on the issue of independent creation or NBC's use of appellants' materials.

C. *Each of appellants' causes of action fails as a matter of law because NBC's undisputed evidence of independent creation prevents a finding that NBC used appellants' ideas*

■ Each of appellants' causes of action requires a finding that NBC wrongfully used appellants' ideas. Because NBC has presented undisputed evidence of independent creation, thus preventing a finding of use, none of appellants' causes of action can survive. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493] [a defendant may prevail on summary judgment by showing that one or more elements of a cause of action cannot be established].)

1. *The first and fourth causes of action for breach of contract and breach of confidence*

Appellants assert that their evidence of the sequence of events during the 18 months preceding NBC's announcement of *Next Action Star* raises material issues of fact on the issue of whether NBC breached the written confidentiality agreement or breached appellants' confidence by using ideas from *Hollywood Screentest* to its benefit, rather than guarding those confidences or paying reasonable compensation for use of those confidences.

Appellants' theory is dependent on a showing that NBC actually used appellants' ideas. NBC's strong and undisputed evidence of the independent creation of *Next Action Star*, which occurred without the involvement of NBC, negates these causes of action.

2. *The second, fifth and sixth causes of action for breach of implied-in-fact contract, unjust enrichment/quantum meruit, and accounting*

In support of appellants' opposition to NBC's summary judgment motion, Pascucci provided a declaration which stated that he communicated his intention that he and HST be compensated by NBC for "any hard work, use and benefits obtained by NBC" resulting from his submissions. Appellants describe the resulting implied-in-fact contract as a contract "to compensate Pascucci and HST for any use it made of *Hollywood Screentest*." Appellants argue that the existence of an implied-in-fact contract is a question of fact, and again point to the 18-month time period during which communications went on between appellants and NBC. Appellants argue that a reasonable trier of fact could conclude that an implied-in-fact contract arose, thus creating an obligation for NBC to pay appellants reasonable compensation for their use of appellants' ideas. If equity requires NBC to pay reasonable compensation, appellants claim, an accounting is proper.

Appellants' cause of action for an implied-in-fact contract for payment in exchange for the use of ideas necessarily requires a finding that NBC actually used appellants' ideas. As discussed above, that element is negated by the uncontradicted evidence of the independent creation of *Next Action Star*. Therefore, the cause of action for breach of implied-in-fact contract and the related causes of action for equitable awards fail as a matter of law.

### 3. *The third cause of action for breach of the covenant of good faith and fair dealing*

In support of their third cause of action, appellants state "NBC may hardly dispute that it breached an implied covenant of good faith and fair dealing" if "it received confidential ideas from Pascucci and HST, and then used those ideas without paying reasonable compensation." (Citing *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371 [272 Cal.Rptr. 387].) Once again, this cause of action requires appellants to prove use of their ideas, which they have not.

### 4. *The seventh cause of action for misappropriation of intangible property*

The elements of a cause of action for common law misappropriation are: "(1) the plaintiff 'has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that "thing" as a kind of property right,' (2) the defendant 'has appropriated the "thing" at little or no cost, such that the court can characterize defendant's actions as "reaping where it has not sown"' and (3) the defendant 'has injured plaintiff by the misappropriation.' [Citations.]" (*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 561 [59 Cal.Rptr.2d 36].)

Because of the uncontradicted evidence of the independent creation of *Next Action Star* by unrelated entities, appellants cannot show that NBC appropriated any ideas from appellants. Without that essential element, this cause of action fails.[10]

### 5. *The eighth cause of action for unfair competition*

Appellants' final cause of action is a statutory cause of action for unfair competition under Business and Professions Code section 17200 et seq.

---

[10] NBC argues in the alternative that this cause of action fails because, under *Desny, supra,* 46 Cal.2d at pages 731–732, ideas are not considered property. Because we find that the negation of the element of use disposes of this cause of action, we do not address the parties' debate on this issue, nor do we address any of NBC's other alternative arguments as to why appellants' causes of action fail.

That statute imposes penalties for "any unlawful, unfair or fraudulent business act or practice." (*Id.*, § 17200.) Appellants argue that the evidence permits the inference that NBC wanted appellants to continue to work with NBC while NBC pursued the *Next Action Star* deal with GRB Entertainment and Silver Pictures. Appellants argue that NBC's motive was to prevent appellants from seeking and obtaining a deal with another network that would result in *Hollywood Screentest* being broadcast in competition with, and even prior to, *Next Action Star*. Appellants sought disgorgement and/or restitution, preliminary and permanent injunctive relief, and attorney's fees under this cause of action.

The uncontradicted evidence of the independent creation of *Next Action Star*, without the involvement of NBC, negates the necessary finding that NBC's actions were unfair, unlawful, or fraudulent. (See *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 890 [85 Cal.Rptr.2d 301] [affirming summary judgment under Bus. & Prof. Code, § 17200 on the grounds that the business practice at issue was not unfair, unlawful, or fraudulent].) In addition, appellants point to no evidence that they were prevented in any way from seeking a deal with another network.

### III. *The demurrer as to respondent Zucker*

Appellants contend that Zucker's demurrer should have been overruled on one cause of action: "breach of confidence." The basis for Zucker's demurrer as to this cause of action was that he signed the confidentiality agreement as an agent for NBC Entertainment, and an agent cannot be personally liable on a contract he signs for his corporate employer. The trial court agreed. Appellants' argument in opposition to the trial court's ruling centers on appellants' position that Zucker's conduct in breaching appellants' confidence was a tort, rather than a breach of contract.

As discussed above in part II.B.1, appellants' cause of action for "breach of confidence" requires a finding that respondents actually used appellants' confidential information to their benefit. We have determined that appellant's claim for breach of confidence fails as a matter of law because the clear, uncontradicted evidence that *Next Action Star* was independently created by entities that were not involved with NBC at the time prevents a finding of such use. This analysis applies equally to respondent Zucker as well as NBC. Therefore, we need not address the parties' competing contentions as to the nature of the breach of confidence cause of action.

## DISPOSITION

The order granting summary judgment is affirmed.

Boren, P. J., and Doi Todd, J., concurred.